UNITED STATES of America, Appellee,

v.

Dennis GEANEY and Vincent Russell Lynch, Defendants-Appellants.

Nos. 196, 197, Dockets 33629, 33630.

United States Court of Appeals Second Circuit.

Argued Oct. 3, 1969.

Decided Nov. 6, 1969.

4. *Provident Bank, supra,* p. 111, 83 S.Ct. p. 739.

Frank M. Tuerkheimer, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, Elkan Abramowitz, Asst. U. S. Atty., of counsel), for appellee.

John C. Lankenau, New York City (Lankenau, Schwartz & Kovner, New York City, Allen G. Schwartz and Victor A. Kovner, New York City, of counsel), for defendant-appellant, Dennis Geaney.

Abraham Solomon, New York City, for defendant-appellant, Vincent Russell Lynch.

Before FRIENDLY, SMITH and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

Geaney's appeal from his conviction after a jury trial before Judge Tyler in the District Court for the Southern District of New York, neatly raises the vexed question of the sufficiency of evidence of conspiracy to warrant the ad-

mission of declarations of alleged co-conspirators in furtherance of the conspiracy.

The Government's case was presented primarily through the testimony of Carol McKeever, at whose apartment in the Bronx defendant Lynch, the prime mover in the conspiracy, lived. In June 1968, Lynch told his mistress that he intended to rob a bank; he later identified the branch of Manufacturers Hanover Trust Co. on City Island as the place and the day after Labor Day, September 3, 1968, as the time. Originally McKeever was to act as a decoy to divert the attention of the police to the southern end of the island while the robbers crossed the bridge at the northern end. Later the plan was changed so that the robbers would leave the island by boat and McKeever's role was somewhat reduced.

Early in August Lynch told McKeever that Geaney's job would be to steal a car, another defendant, Donnellan,[1] was to get the boat, and Lynch would get the guns. In fact, Geaney had been riding with Lynch and McKeever prior to this conversation but had left them on spotting a double-parked car. Shortly after the conversation he returned without the car, saying that the keys had not been left in it. A few weeks later, on joining Lynch and Geaney near a bar, McKeever was asked by Lynch whether she had seen their truck. Pointing to a yellow-panelled truck bearing the words "Madam Pauline's Laundry and Dry Cleaner," he explained they had stolen it in Queens where they found it double-parked with the motor running.

Another witness, Robert Scott, testified that in mid-August, he had told Donnellan he wished to sell a motor boat; that the two picked up Geaney and drove to Scott's home to inspect the boat; that Donnellan agreed to pay $400 for it; that the three men then brought the boat to the Bronx, picked up Lynch, took the boat to Edgewater Park on the mainland and put it into Eastchester Bay.

Having been joined by Lynch's younger brother, they crossed to City Island, paying close attention to the time required.

Taking up the story from there, McKeever testified that she, Donnellan, Geaney, and the two Lynches later took another ride in the boat. The senior Lynch observed in the presence of McKeever, Donnellan and Geaney, that it was much too slow and would never do and that unless it was fixed they would have to get another. All agreed. Lynch cautioned the others not to say anything in front of his younger brother, who was driving the boat, since "I don't want him to know about it." Photographs taken with unwise bravado in McKeever's apartment before the boat ride were received in evidence. Two showed Donnellan and Lynch, respectively, holding a shotgun; the other showed Geaney, Lynch and Donnellan together drinking beer.

Shortly after the second boat ride Lynch reported to McKeever that Geaney "didn't want to do the bank job, because he had just gotten out of jail and he had been arrested, and he was out on bail," but that if Lynch and Donnellan had to act alone, they would do so. McKeever responded that she would be waiting at Edgewater to drive them back to her apartment.

Early on the morning after Labor Day, Donnellan, driving the yellow-panelled truck, picked up Lynch in McKeever's apartment. Later McKeever, on Lynch's instructions, bought two pairs of surgical gloves to be used by the robbers in order to avoid leaving fingerprints. Meeting Donnellan and Lynch at the dock in Edgewater Park, where she saw defendant Novak[2] for the first time, she asked "What's he doing here." Lynch responded "that he was going to drive the boat for two hundred dollars and that he was going to take Dennis' [Geaney's] place." Shortly thereafter Donnellan departed for City Island in the yellow-panelled truck and Lynch and

---

1. Donnellan was convicted but has not appealed.

2. Novak also was convicted but has not appealed.

Novak in the boat. McKeever was told to remain at the dock with her car for twenty minutes; when these had expired, she returned to her apartment.

Other evidence established Donnellan's and Lynch's robbery of the bank, their departure from it in the truck, their escape in the boat from City Island to Edgewater Park, and their proceeding from there in Lynch's car to McKeever's apartment where they divided the loot.

Geaney claimed that while he had been associating with Lynch, Donnellan and McKeever, he had no knowledge that they planned a robbery and had ridden on the motor boat solely for recreation. He also denied that the photograph of himself drinking beer with Lynch and Donnellan had been taken at the same time as the photographs with the shotgun, despite the identity of Lynch's and Donnellan's costumes.

In dealing with the admissibility of the hearsay declarations of conspirators, we start from the proposition stated in United States v. Renda, 56 F.2d 601, 602 (2 Cir. 1932), with reference to the defendant D'Agostino in that case:

> "The declarations of one party to a concerted mutual venture are admitted against the rest on the notion that they are acts in its execution. [Citations omitted.] In so far as they are such, they are authorized by all, and are treated as their admissions. However, obviously the declaration cannot prove the authority any more than that of an agent. The party to be implicated must be shown independently to be in fact a party to the venture; else there is no authority to act for him."

D'Agostino's point was of rather stark simplicity; there was no evidence against him except the alleged coconspirator's declaration, and his conviction was therefore reversed. Later opinions, particularly those by Judge Learned Hand, who was quite obviously the author of *Renda*, elaborated that it was for the judge to determine whether there was sufficient evidence that the defendant against whom the declarations were offered had engaged in "a concerted mutual venture" with the declarant. United States v. Nardone, 127 F.2d 521, 523 (2 Cir.), cert. denied, 316 U.S. 698, 62 S.Ct. 1296, 86 L.Ed. 1767 (1962); United States v. Pugliese, 153 F.2d 497, 500 (2 Cir. 1945); United States v. Dennis, 183 F.2d 201, 230–231 (2 Cir. 1950), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

What has been left in some doubt, both in Judge Hand's opinions and in later ones for this court, is the quantum of such evidence that will suffice. In United States v. Ross, 321 F.2d 61, 68 (2 Cir.), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963), we said, in an opinion by the writer, that "the amount of proof *aliunde* as to the existence of a conspiracy that is required to render such evidence admissible is not as high as the amount needed to warrant submission of a conspiracy charge to the jury"—without stating, however, just how "high" it must be. And in United States v. Ragland, 375 F.2d 471, 477 (2 Cir. 1967), cert. denied, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968), Judge Waterman wrote that "The threshold requirement for admissibility is satisfied by a showing of a likelihood of an illicit association between the declarant and the defendant although it might later eventuate that evidence so admitted proves to be insufficient to justify submitting to the jury the issue of defendant's alleged guilty involvement with the declarant." See also United States v. Borelli, 336 F.2d 376, 387 (2 Cir. 1964), cert. denied, Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965); United States v. Corallo, 413 F.2d 1306, 1324–1325 (2 Cir. 1969).

To require that the independent proof necessary to admit utterances of one conspirator against another should be sufficient for submission of the conspiracy charge to the jury would not, as has sometimes been argued, make the receipt of such utterances valueless to the

prosecution. Although the proof *aliunde* may suffice for submission to the jury, the jury might not be convinced by it and the utterances might tip the scale. However, this court has plainly refused to set the threshold test that high.

■ The circumstance that in a conspiracy trial the preliminary issue on the admissibility of evidence coincides with the ultimate one of the defendant's guilt should not cause the trial judge to abdicate his traditional duty to decide those issues of fact which determine the applicability of a technical exclusionary rule. When the matter is viewed from the standpoint of the trial judge, it may be hard to say more than that he must satisfy himself of the defendant's participation in a conspiracy on the basis of the non-hearsay evidence. Morgan, Functions of Judge and Jury in the Determination of Preliminary Questions of Fact, 43 Harv.L.Rev. 165, 182–89 (1929). See also Maguire and Epstein, Preliminary Questions of Fact in Determining the Admissibility of Evidence, 40 Harv. L.Rev. 392, 415–20 & n. 20 (1927). Setting the standard that high avoids the risk that the requirement of independent evidence will be rendered "virtually meaningless," as some courts are said to have done. *See* Note, Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 922, 987 (1959). While the practicalities of a conspiracy trial may require that hearsay be admitted "subject to connection," the judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances. If it has, the utterances go to the jury for them to consider along with all the other evidence in determining whether they are convinced of defendant's guilt beyond a reasonable doubt. If it has not, the judge must instruct the jury to disregard the hearsay or, when this was so large a proportion of the proof as to render a cautionary instruction of doubtful utility, as could well have been the case here, declare a mistrial if the defendant asks for it.[3] Since we must assume on appeal that the trial judge was satisfied of the existence of a conspiracy on the basis of non-hearsay evidence the question becomes whether he had reasonable grounds to be so.

■■ It is difficult, of course, for the trial judge or a reviewing court to perform the intellectual feat of assessing the independent evidence free from the color shed upon it by the hearsay. But the effort must be made, and we now essay it here. Starting with Geaney's unsuccessful attempt to steal a double-parked car, we first add his adoption of Lynch's statement, *see* 4 Wigmore, Evidence § 1071 (3d ed. 1940), concerning his theft of the yellow-panelled truck in mid-August and the further fact that the self-same truck remained in the possession of the conspirators and was used in the robbery a fortnight later. We then add Geaney's journey with Donnellan to pick up Scott's boat and his later joining with the two Lynch brothers in timing it between City Island and Edgewater Park—the precise escape route planned for the robbery. Then came the second boat ride, where the elder Lynch said in his hearing that the boat was too slow—for something—and that Lynch

---

3. We emphasize for clarity that all the foregoing discussion relates only to utterances whose receipt in evidence would otherwise be banned by the hearsay rule. "Acts" of the other conspirators stand on quite a different basis, despite the constant attempts of defense counsel to ignore this. See Lutwak v. United States, 344 U.S. 604, 617–619, 73 S.Ct. 481, 97 L.Ed.2d 593 (1953); United States v. Costello, 352 F.2d 848, 853–854 (2 Cir. 1965), rev'd on other grounds, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). These cases also show the lack of merit in Geaney's . contention that the jury should have been instructed to disregard evidence of acts subsequent to his withdrawal. As said in United States v. Borelli, *supra*, 336 F.2d at 384, "the gist of the offense remains the agreement," and acts subsequent to withdrawal are relevant to show what the agreement was.

did not want the younger brother to hear about the scheme.[4] Finally there are the photographs and also the various adverse inferences the jury could draw from Geaney's own testimony, especially in regard to these, see United States v. Arcuri, 405 F.2d 691, 695 n. 7 (2 Cir. 1968), cert. denied, 395 U.S. 913, 89 S.Ct. 1760, 23 L.Ed.2d 227 (1969). With the proponent having submitted substantial proof of Geaney's guilt, the judge could take into account the likelihood that in Judge L. Hand's well-known phrase, the jury would find "not only that the witness' testimony is not true, but that the truth is the opposite of his story * * *." Dyer v. MacDougall, 201 F.2d 265, 269 (2 Cir. 1952). It is true that almost every one of these items is susceptible of an explanation other than Geaney's participation in the conspiracy. However, pieces of evidence must be viewed not in isolation but in conjunction. A man may steal cars for many purposes, usually for quick disposition, and may take boat rides for many others, mostly innocent. On the other hand, the combination of stealing a car that was not disposed of or even kept by the thief but rather was used by acquaintances in a bank robbery several weeks later, and of participating in two tests of a boat similar to one ultimately so used, is not likely to be a mere coincidence. As said in United States v. Monica, 295 F.2d 400, 401 (2 Cir. 1961), cert. denied, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962), "each of the * * * episodes gained color from each of the others." We thus have no hesitation in holding that the judge could properly have been satisfied on the independent non-hearsay evidence that Geaney had associated himself in "a concerted mutual venture."

■ Geaney asserts that, even so, Lynch's statement that Novak was taking his place was inadmissible because Geaney had then withdrawn from the conspiracy. But Lynch's statement amounted to no more than a repetition and amplification of his earlier statement to McKeever announcing Geaney's withdrawal, made necessary by the appearance of a person previously unknown to her. Lynch's "agency" to communicate the withdrawal was sufficient to make this statement admissible against Geaney. We thus do not need to consider the Government's alternative argument that Lynch's statement came within the hearsay exception for utterances "contemporaneous with a nonverbal act, independently admissible, relating to that act and throwing some light upon it." Morgan, A Suggested Classification of Utterances Admissible as Res Gestae, 31 Yale L.J. 229, 236 (1922). See United States v. Annunziato, 293 F.2d 373, 376–377 (2 Cir. 1961), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961); United States v. Markis, 352 F.2d 860, 864 (2 Cir. 1965), rev'd on other grounds, 387 U.S. 425, 87 S.Ct. 1709, 18 L.Ed.2d 864 (1967).

With the hearsay declarations properly received, the totality of the evidence was clearly sufficient to convince a reasonable juror of Geaney's guilt beyond a reasonable doubt.

■ Lynch's sole point is that whereas he had requested the court to charge in the language of the instruction requested in Bruno v. United States, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939):

"The failure of any defendant to take the witness stand and testify in his own behalf, does not create any presumption against him; the jury is charged that it must not permit that fact to weigh in the slightest degree against any such defendant, nor should this fact enter into the discussions or deliberations of the jury in any manner."

---

4. These are good illustrations of utterances which are not hearsay, see fn. 3. It was quite immaterial whether in fact the boat was too slow or Lynch didn't want his younger brother to hear about the scheme. The important thing is that Lynch made the statements, not their truth or falsity.

Judge Tyler in fact charged

"You will recall that the defendants Donnellan, Lynch and Novak elected not to testify as witnesses here on their own behalf. Under our systems, ladies and gentlemen, it is their right to elect. The fact that these men did not testify is not to weigh against them in any fashion, nor is this fact to even be considered or discussed by you when you retire to your deliberation in the jury room."

If any difference is detectable, Judge Tyler's instruction was more favorable to the defense in avoiding the word "presumption." Lynch's appeal should not have been taken.

On Geaney's appeal the judgment is affirmed; Lynch's appeal is dismissed as frivolous.