UNITED STATES of America, Appellee,

v.

**Michael GLAZER, Appellant.**

**No. 286, Dockets 75–1213, 75–1301.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 3, 1975.

Decided March 1, 1976.

---

Phylis Skloot Bamberger, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City), for appellant.

Bart M. Schwartz, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty., and T. Barry Kingham, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before WATERMAN, OAKES and MESKILL, Circuit Judges.

WATERMAN, Circuit Judge:

On April 25, 1975, appellant Michael Glazer was convicted after a jury trial in the United States District Court for the Southern District of New York, Lloyd F. MacMahon, *Judge,* for having violated 18 U.S.C. § 1001[1] by submitting false documents to the Federal Department of Housing and Urban Development. He was sentenced to a three-month term of imprisonment and a $10,000 committed fine. Glazer appeals from that conviction seeking reversal or, in the alternative, a new trial, and the vacation of the $10,000 fine.

Glazer and five others had been charged in an indictment of February 13, 1975, with a bid-rigging scheme in connection with a Government relocation project.[2] At trial the Government presented evidence that in 1973, a large manufacturing company, Universal Metal Chain Company ("Universal"), was arranging for its relocation to New Jersey from a federally financed urban renewal area in Brooklyn. The owner of Universal, one Richard Laupot, hired a Dennis Green, the operator of a moving consultant firm, to make preparations for the move. Green was to determine which movers would be asked to submit bids, and was then to file with the City of New York the bids of those selected. For his services, Green would receive a customary nominal fee from the relocating tenant, Universal, and also ten percent of the cost the successful contractor would be paid for doing the moving for the tenant. In November, 1973, two partners in the commercial moving business, Jack Kay and Samuel Wagner, were conniving to secure the contract to move Universal. Early in the month they approached Green and offered a $6,000 kickback to the owner of Universal in exchange for Green's agreeing to permit Wagner and Kay to control the competitive bidding procedures so as to insure that they would submit the lowest bid. Wagner and Kay also offered help to Green in his dealings with the New York City administration and to prepay Green's ten percent fee.

There followed a series of discussions between Laupot, Green, Wagner, Kay and a business associate of the latter two, Sinigaglia, in which plans for the bid-rigging scheme were developed and solidified. Most of these discussions were electronically monitored and recorded for, unbeknownst to Wagner, Kay and Sinigaglia, Green immediately after his first meeting with Wagner and Kay had contacted law enforcement authorities concerning the scheme. On December 6, 1973, Wagner obtained from Green three official bid forms and envelopes and the Contractor's Assignment already signed by Laupot. Shortly thereafter, Wagner and Sinigaglia signed Green's usual fee contract, and on December 11, Green was notified that appellant Glazer, owner of Stuyvesant Moving Vans, and Sanford Scher, another mover, would be the two high bidders on the project.

Glazer had apparently first learned of the Universal moving job in early December when Wagner came to the Stuyvesant office and, after asking whether he was interested in bidding on the job, gave Glazer a bid form. According to Glazer's employee

---

1. The statute provides:

    § 1001. Statements or entries generally

    Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. Glazer and five others were charged with two counts each of submitting false documents, and one count each of conspiracy to violate 18 U.S.C. § 1001. A co-defendant, Scher, was charged with two counts of perjury. Two others, Wagner and Sinigaglia, pleaded guilty to the conspiracy count, and Scher pleaded guilty to one count of perjury. The case against a fifth, Marks, was dismissed. Glazer was tried with the sixth defendant, Jack Kay, who was convicted on all counts. Glazer was found guilty on one substantive charge and was acquitted on the conspiracy count. No verdict was rendered as to him on the other substantive count.

Harvey Marks, who estimated the cost of moving jobs for Stuyvesant in preparation for the submission of bids, Glazer then told Marks to look at the Universal job and said that Stuyvesant would bid on it. Although Glazer did not normally do relocation jobs, Marks and Glazer prepared a bid of $294,-000, detailing the work to be performed, based upon Marks' inspection of the site. The bid proposal form was signed by Glazer who thereby certified that he had not been a party to any agreement to fix the price of any bid or to file a collusive or sham bid. Two days later, Glazer's bid, and Scher and Wagner-Sinigaglia's bids of $274,000 and $250,000 respectively, were opened. Present were Green and Wagner, and, in accordance with Wagner's earlier suggestion that one of the losers attend the opening to lend an air of legitimacy, also Sanford Scher. All of the bids were rejected, however, as they omitted the cost of moving one of Universal's buildings, 161 Clymer Street, and included the cost of some work which was part of another bid. A second round of bids was solicited from the three earlier bidders, and Wagner advised Green that he was keeping the same bidders for this new round. These new bids were scheduled to be opened on December 28, 1973. Marks accordingly prepared a revised bid for Glazer's approval. However, Marks, who had not previously inspected the building at 161 Clymer Street on his first visit to Universal, did not reinspect the Brooklyn site. Marks also did not discuss the new proposed bid with Glazer except to tell him that an additional building had been included in the job. Glazer then selected the second bid price. On December 28 the second round of bids was opened and Wagner was again the low bidder. The City did not make a final award to any of the three bidders here involved.

In support of his argument for a reversal of his conviction, appellant alleges two points of error. First, he contends that the jury was not properly charged on the requisite elements of a violation of 18 U.S.C. § 1001. He next maintains that hearsay evidence of his connection with Wagner was improperly admitted into evidence. In support of his prayer that the $10,000 fine be vacated, appellant argues that the fine is unconstitutional because his inability to pay the fine will result in imprisonment and also because the fine itself is excessive and therefore constitutes cruel and unusual punishment. Finding these contentions to be without merit, we affirm appellant's conviction and do not disturb the sentence imposed upon him.

■ Appellant contends that the charge given by Judge MacMahon failed to inform the jury that in order to find Glazer guilty the jury must conclude that Glazer had made a knowing misstatement as to whether he was a party to any agreement to fix the bid price or to submit a sham or collusive proposal or bid. As Glazer failed to object below to the purportedly defective charge, in order to warrant reversal of the conviction the error must be one which affects "substantial rights" of the appellant and thus be "plain error." Rule 52(b), Fed. R.Crim.Proc.; *United States v. Indiviglio,* 352 F.2d 276, 280–81 (2d Cir. 1965) (en banc), *cert. denied,* 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

Appellant directs our attention to a portion of the charge where it was stated:

As to the second element that the statement or representation was false, fictitious or fraudulent, if you find that the defendant whom you are considering certified on the bid submitted to the New York Housing Development Administration that there had been no agreement to fix the bid price or any part of the bid price or to submit a sham or collusive bid when in fact there was such an agreement, then the second element has been satisfied.

This, appellant argues, failed to make clear to the jurors that they must find that Glazer had been a party to the agreement, unquestionably a necessary finding under § 1001. While we would be constrained to agree with appellant's allegations of misstatement and inadequacy if the quoted portion of the charge constituted the court's sole instruction on the issue of Glazer's participation in the agreement to fix the bid

price, in view of the court's earlier statement in the charge on the issue we must disagree. In his opening explanation of the substantive crime charged, Judge MacMahon stated in relevant part: ·

> Counts 2 and 3 of the indictment charge that Defendant Kaps and Counts 6 and 7 charge that the Defendant Glazer . . unlawfully, willfully and knowingly made false, fictitious and fraudulent statements and representations in a bid for moving business concerns, . . . in that *they falsely represented that there had been no agreement with any other person to fix the price or to submit a collusive or a sham bid.* [emphasis added]

While of course the statement might have been more precisely worded, a suggestion quite easily and frequently made in retrospect, we are satisfied that the charge adequately informed the jury that in order to be guilty of the crime charged Glazer must have been a party to an agreement with some other person. Certainly there has been no omission or misstatement tantamount to that found in such cases as *United States v. Clark,* 475 F.2d 240 (2d Cir. 1973), *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), or *United States v. Fields,* 466 F.2d 119 (2d Cir. 1972), where essential elements of the charged offenses were wholly omitted. Nor is the case analogous to *United States v. Byrd,* 352 F.2d 570 (2d Cir. 1965), where in the climax of the charge in a short reiteration of the nub of the law, the court completely omitted intent as an essential ingredient of the crime charged. Here, the allegedly defective portion of the charge focused on by appellant was in fact, as the trial court stated, only intended to explain the second of three elements comprising the substantive offense, and not to describe the entire course of conduct which established a violation. That full statement of the offense, as quoted above, had already been given in language closely paralleling the indictment, and we find no statement or omission which

would rise to the level of plain error. Examining Judge MacMahon's charge in its entirety, we are convinced that the jury was properly and adequately apprised of the elements of the offense with which Glazer was charged, and it specifically was apprised that before a guilty verdict could be reached, it had to find that Glazer falsely reported that he had not been a party to any bid-rigging scheme.

Although he was acquitted on the conspiracy count, appellant next claims that hearsay statements made by his alleged co-conspirators were improperly admitted into evidence without the Government first having established by a fair preponderance of non-hearsay evidence that a joint venture existed, *United States v. Geaney,* 417 F.2d 1116 (2d Cir. 1969), *cert. denied sub nom. Lynch v. United States,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), and that appellant participated in it, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).[3] In *United States v. Nardone,* 127 F.2d 521, 523 (2d Cir.), *cert. denied,* 316 U.S. 698, 62 S.Ct. 1296, 86 L.Ed. 1767 (1942), we made clear that it is for the trial judge to determine whether there is sufficient evidence that the defendant against whom the hearsay declarations are offered had engaged in a "concerted mutual venture" with claimed co-conspirators. In *United States v. Ragland,* 375 F.2d 471, 477 (2d Cir. 1967), *cert. denied,* 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968), we further said that:

> The threshold requirement for admissibility is satisfied by a showing of a likelihood of an illicit association between the declarant and the defendant although it might later eventuate that the independent evidence so admitted proves to be insufficient to justify submitting to the jury the issue of defendant's alleged guilty involvement with declarant.

We have repeatedly reaffirmed the *Geaney* formulation of a "fair preponderance" of non-hearsay evidence as the quantum of

---

**3.** As we earlier stated in *United States v. Renda,* 56 F.2d 601, 602 (2d Cir. 1932), "[t]he party to be implicated must be shown independently to be in fact a party to the venture; else there is no authority to act for him."

proof which must be established before the hearsay declarations of associates in the illicit venture may be admitted against the defendant. Most recently, in *United States v. Wiley,* 519 F.2d 1348, 1350–51 (2d Cir. 1975), we rejected the argument here advanced by appellant that dictum in *United States v. Nixon,* 418 U.S. 683, 701 n. 14, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039, 1060 (1974) indicates that a "proof beyond a reasonable doubt" test should be substituted for the *Geaney* standard. We once again reject that argument and the more rigorous standard urged upon us. And, having studied the record, we find sufficient grounds to support the trial court's determination that defendant's participation in the alleged conspiracy was established by a "fair preponderance" of non-hearsay testimony and documentary proof, and therefore that the hearsay statements made by Glazer's claimed co-conspirators were thereafter properly admitted.

There was testimony at trial by Harvey Marks that during the period of Marks' employment at Stuyvesant, Glazer had consistently refused to bid on relocation jobs except in the one case of the Universal project. It is also noteworthy that Glazer received the bid forms for the Universal project from a competitor who was bidding on the same job, a procedure which Marks testified was surprising. Even though Glazer later admitted receiving these forms from Wagner, he first reported on the bid proposal form that he had been selected to submit the bid by Universal and not by Wagner. Also the evidence was uncontradicted that neither Glazer nor Marks inspected the building at 161 Clymer Street before either the first or the second bid. They thus did not know the size of the building, the nature of its contents nor the work required to move it. Marks stated at trial that he knew of no other instance in which a bid had been submitted without first having inspected the entire premises or having studied specifications of the items to be moved. Yet, in this case no specifications for the 161 Clymer Street site were obtained by either Marks or Glazer and, indeed, at trial Glazer corroborated Marks' testimony that he never knew the extent of work which might be required to move the contents of 161 Clymer Street. Finally, it is not without relevance that in both instances, Glazer's was the highest bid and Wagner's the lowest.

Thus, the non-hearsay evidence established that Glazer submitted the highest bids on a type of job he normally did not bid on, and that he received the bid forms from a competitor who turned out to be the lowest bidder. Moreover, contrary to his prior unvarying practice and what would seem sound business practice, Glazer submitted his second bid without any inspection of the premises that had been omitted from the first bid. That evidence was sufficient under *Geaney* and *Glasser* to establish that an illicit association had been formed and that Glazer was a party to it. Therefore, the admission against Glazer of hearsay statements made by his associates in the venture was completely justified.

Appellant's only remaining assertion pertains to his sentence. In the first of his tandem challenges, Glazer claims that as he is insolvent, he will be unable to pay the fine and will thus be subject to an additional thirty-day period of incarceration, 18 U.S.C. § 3569,[4] for that failure to pay. Relying primarily on *Tate v. Short,* 401 U.S.

---

4. The statute provides:

§ 3569. Discharge of indigent prisoner

  (a) When a poor convict, sentenced for violation of any law of the United States by any court established by enactment of Congress, to be imprisoned and pay a fine, or fine and costs, or to pay a fine, or fine and costs, has been confined in prison thirty days, solely for the nonpayment of such fine, or fine and costs, such convict may make application in writing to the nearest United States magistrate in the district where he is imprisoned setting forth his inability to pay such fine, or fine and costs, and after notice to the district attorney of the United States, who may appear, offer evidence, and be heard, the magistrate shall proceed to hear and determine the matter.

  If on examination it shall appear to him that such convict is unable to pay such fine, or fine and costs, and that he has not any property exceeding $20 in value, except such

395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971), *Williams v. Illinois,* 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970) and *Morris v. Schoonfield,* 399 U.S. 508, 90 S.Ct. 2232, 26 L.Ed.2d 773 (1970), he claims that such incarceration for a period beyond the term of his sentence of imprisonment, an incarceration imposed upon him solely because he is indigent, violates his rights to due process and equal protection.

The Government argues that appellant's challenge on these grounds is premature and not now ripe for decision because the committed fine statutes have not yet been applied to Glazer and may never be if he obtains funds to pay the fine before his three-month prison term is concluded. Precisely such an argument was raised by the state in *People v. Williams,* 41 Ill.2d 511, 517, 244 N.E.2d 197, 200 (1969), where Williams, while serving the third month of a year-long sentence, challenged the fine imposed upon on grounds identical to those voiced by Glazer. The Supreme Court of Illinois rejected the prematurity argument and went on to decide appellant's constitutional claim on the merits. On appeal to the United States Supreme Court, *Williams v. Illinois,* 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970), the Illinois court's conclusion with respect to prematurity was left undisturbed and the Court proceeded to the merits. We too reject the prematurity argument. However, in view of a second argument made by the Government, that Glazer will never be imprisoned for failure to pay the fine imposed upon him for the Bureau of Prisons has tailored its procedures to fully accommodate the constitutional standards enunciated in *Tate, Williams* and *Morris,* we need not reach the constitutional issue appellant urges upon us. The Bureau of Prisons Policy Statement 2101.2A (June 25, 1971)[5] makes clear that

---

as is by law exempt from being taken on execution for debt, the magistrate shall administer to him the following oath: "I do solemnly swear that I have not any property, real or personal, exceeding $20, except such as is by law exempt from being taken on civil process for debt; and that I have no property in any way conveyed or concealed, or in any way disposed of, for my future use or benefit. So help me God." Upon taking such oath such convict shall be discharged; and the magistrate shall file with the institution in which the convict is confined, a certificate setting forth the facts. In case the convict is found by the magistrate to possess property valued at an amount in excess of said exemption, nevertheless, if the Attorney General finds that the retention by such convict of all of such property is reasonably necessary for *his support or that of his family,* such convict shall be released without further imprisonment solely for the nonpayment of such fine, or fine and costs; or if he finds that the retention by such convict of any part of such property is reasonably necessary for his support or that of his family, such convict shall be released *without further imprisonment* solely for nonpayment of such fine or fine and costs upon payment on account of his fine and costs, of that portion of his property in excess of the amount found to be reasonably necessary for his support or that of his family.

(b) Any such indigent prisoner in a Federal institution may, in the first instance, make his application to the warden of such institution, who shall have all the powers of a United States magistrate in such matters, and upon proper showing in support of the application shall administer the oath required by subsection (a) of this section, discharge the prisoner, and file his certificate to that effect in the records of the institution.

Any such indigent prisoner, to whom the warden shall fail or refuse to administer the oath may apply to the nearest magistrate for the relief authorized by this section and the magistrate shall proceed de novo to hear and determine the matter.

5. Section 4 of the Statement is entitled "ACTION" and it provides:

a. If an inmate serving a sentence of imprisonment cannot, because of poverty, pay a committed fine which has been imposed as a part of his sentence, he cannot be held beyond his release date solely for non-payment of the fine.

b. Whenever such a person reaches his release date, whether by parole, mandatory release, or full-term expiration, he shall be released on the regularly scheduled date and shall not be held further for any non-payment of a committed fine.

c. In order to substantiate the indigency status of the inmate, the Warden or his designated representative shall take a sworn statement from the inmate in the following form: "I do solemnly swear that I have no property, real or personal, with which I can pay the fine imposed on me, except property which is by law exempt from being taken on civil process for debt. I have no proper-

no inmate unable to pay a committed fine will be incarcerated for a longer term solely for that reason. All the indigent inmate need do is make a sworn statement to the effect that he is in fact impecunious. Thus, the procedure for dealing with indigents unable to pay committed fines has been carried out, and we have no reason to doubt that it will not continue to be so carried out, in full conformity with *Tate, Williams* and *Morris*. In accordance with the Policy Statement, if Glazer is still indigent approximately thirty days prior to his scheduled release date, he may make a sworn statement to that effect and will suffer no additional incarceration. Appellant contends that there is no certainty that the Policy Statement will not be withdrawn or superseded at some time. While of course there is no absolute assurance that the policy will be maintained, the Government is entitled to some credit for good faith. The Policy Statement itself, and its direction to the United States Attorney that no commitment for non-payment will be carried out, reflects the Government's cognizance of the *Tate, Williams* and *Morris* holdings. So long as the Policy Statement is effectuated, we see no reason to vacate the imposition of the fine.

▮ Appellant's second challenge to the fine on the ground that it is excessive and therefore constitutes cruel and unusual punishment is readily disposed of. It is well-established that a sentence within the statutory maximum will not be disturbed on appeal except in unusual circumstances. *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); *Gore v. United States,* 357 U.S. 386, 393, 78 S.Ct. 1280, 1285, 2 L.Ed.2d 1405, 1410 (1958); *United States v. Brown,* 479 F.2d 1170, 1172 (2d Cir. 1973). We are convinced that the circumstances of the present case do not

warrant a departure from that policy. Appellant was sentenced to a term of three months and a fine of $10,000 for a crime which carried a maximum of five years imprisonment and a $10,000 fine. Absent any indication that the sentencing judge relied on constitutionally impermissible factors or upon material inaccuracies, *United States v. Mitchell,* 392 F.2d 214 (2d Cir. 1968), *United States v. Holder,* 412 F.2d 212, 214 (2d Cir. 1969), we do not find the sentence to be either excessive or improper.

Affirmed.

---

ty in any way conveyed or concealed to avoid payment of this fine, or in any way disposed of for my future use or benefit."

d. The United States Attorney for the District where the inmate was sentenced should be notified approximately 30 days in advance of the release, and given a copy of the sworn statement of indigency. The United States Attorney should be advised that no

commitment for non-payment pursuant to 18 U.S.C. § 3569 will be carried out in view of the Supreme Court's ruling in the *Williams* and *Tate* cases. A copy of that notification to the United States Attorney should be sent to the Office of General Counsel of the Bureau.

NORMAN A. CARLSON
Director