UNITED STATES of America

v.

Joseph OCCHIPINTI, Defendant.

No. 91 CR 0168 (CBM).

United States District Court,
S.D. New York.

Aug. 23, 1991.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. by Jeh C. Johnson, Steven Standiford, Asst. U.S. Attys., New York City, for U.S.

Norman J. Mordkofsky, Bronx, N.Y., for defendant.

## OPINION

MOTLEY, District Judge.

On June 17, 1991, the Government rested its case. After a hearing and arguments of counsel on June 17, 1991, defendant then moved for a judgment of acquittal on all counts pursuant to Fed.R.Crim.P. 29(a). The court orally denied defendant's motions for judgment of acquittal on all counts. On June 13, 1991, the Government moved the court to make its findings pursuant to *United States v. Geaney*, 417 F.2d 1116 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), with respect to the use of co-conspirator statements as evidence against the defendant. This court made its *Geaney* finding with an Opinion to follow. This opinion sets forth the court's reasons for its rulings.

## DISCUSSION

■ In order to withstand a defendant's motion for judgment of acquittal on a particular count of an indictment, the Govern-

ment must have introduced evidence in its direct case "upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt" on each and every element of the offense. *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984).

At this stage, the Government must also show, by a preponderance of the evidence, that the defendant knowingly and willfully became a member of and participated in the civil rights conspiracy in order to permit co-conspirator statements to be used as evidence against the defendant pursuant to Fed.R.Evid. 801(d)(2)(E). *United States v. Geaney*, 417 F.2d 1116 (2d Cir.), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). "[A] court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted." *Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144, 156 (1987).

■ In order to allow co-conspirator statements to be used as proof against a particular defendant pursuant to Fed. R.Evid. 801(d)(2)(E), the Government must show, by a preponderance of the evidence, that the defendant knowingly and willfully became a member of and participated in the conspiracy charged in the indictment. This proof must consist of evidence independent of co-conspirator statements which could themselves be admissible against the defendant under the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E). However, hearsay statements admissible against a defendant under some other exception may be used by a court in its preliminary determination that the defendant knowingly joined in the conspiracy charged. *United States v. DeJesus*, 806 F.2d 31 (2d Cir.), *cert. denied*, 479 U.S. 1090, 107 S.Ct. 1299, 94 L.Ed.2d 155 (1987).

■ On the basis of the evidence outlined below, the court finds that the Government has introduced sufficient proof upon which a jury could reasonably find the defendant guilty beyond a reasonable doubt as to each count charged in the indictment. The evidence is also sufficient to show that the defendant knowingly and willfully participated in the civil rights conspiracy charged in Count 1 of the indictment.

The defendant, Joseph Occhipinti, is a supervisory special agent in the Immigration and Naturalization Service (INS). He is charged in a 23–count indictment with committing various crimes during the course of investigations connected with "Project Bodega." Project Bodega was implemented by the INS and Agent Occhipinti, the stated object of which was "to investigate ... aliens that were smuggled into [the United States] by the Freddie Then drug cartel to work in bodegas to facilitate some type of drug distribution operation." Tr. 1798. Agent Stafford Williams, Occhipinti's partner during most of the searches, testified as a Government witness [1] and stated that—of 56 searches conducted during Project Bodega—none resulted in links to the Freddie Then drug cartel. Tr. 1806.

## I. COUNT 1—CIVIL RIGHTS CONSPIRACY.

■ Count One charges the defendant with violating 18 U.S.C. § 241, specifically conspiring to violate inhabitants' Fourth Amendment rights by participating in such acts as conducting illegal detentions, searches and seizures, making false statements to cover-up such activities, and embezzling money from the bodegas.

■ In order to establish guilt beyond a reasonable doubt in this conspiracy count, the Government must establish the following five elements: 1) that two or more persons entered into the conspiracy; 2) that the conspirators agreed to the object of the conspiracy, as defined by the Government: "to injure, oppress, threaten or intimidate an inhabitant of a State in the free exercise or enjoyment of [his or her] Fourth Amendment right against unreasonable searches and seizures"; 3) that the conspirators acted under color of law in the course of the

---

**1.** Agent Stafford Williams testified against the defendant under an agreement to receive immunity from criminal prosecution in the Southern District of New York for crimes committed during a period of Project Bodega. Tr. 1772; Exh. 3525B.

conspiracy; 4) that the defendant knowingly became a member of the conspiracy; and 5) that the defendant acted willfully.

It was undisputed that Agent Occhipinti, an INS agent for 15 years, led the Project Bodega investigations and that the searches complained of were conducted under color of law. All of the witness-complainants testified that Occhipinti (typically described as "the short, white agent" rather than named) was the leader, entered their establishments, showed them a business card identifying himself as an INS agent, ordered the other officers around, and conducted the questioning of the store occupants. Agent Williams testified that Occhipinti referred to himself during these searches as "el jefe," the boss.

Agent Williams supplied evidence that he and agent Occhipinti acted in concert and, thus, entered into a conspiracy. Agent Williams testified that he and defendant would on occasion drive around upper Manhattan, spot an uncrowded bodega, and on no suspicion at all, stop and conduct a search of the premises. Tr. 1811–12. He testified that on one occasion, after leaving a store in which they had conducted an investigation, and as they placed the evidence in the rear of their squad car, "Mr. Occhipinti looked over his shoulder and he saw this unknown bodega and he said, let's go there." Tr. 1814. They did. On these occasions, Agent Williams testified, they were searching for "any evidence of a crime." While Occhipinti questioned an employee inside the store, Agent Williams "ordered the door closed [and] [t]he door was locked." Tr. 1815. The two agents then questioned and searched the 8 to 10 occupants of the store even though Agent Williams knew he was violating their Fourth Amendment rights. Tr. 1816. He testified that, often, during Project Bodega they seized money from "any and everywhere" and counted it as gambling proceeds even if there was no evidence to that effect. Tr. 1825.

At the search of 350 Bowery in Manhattan, an alleged brothel, Agent Williams testified that Occhipinti became "frustrated over his inability to obtain a consent to search" and told the agents to conduct a search anyway. Tr. 1793. Williams testified that he conducted the search even though he knew it was wrong. Tr. 1794. During the course of this search, another agent found a gun under a mattress and was told by Occhipinti that "if anyone asks you where the gun was found, say it was found in plain view." Tr. 1796.

Williams testified that some of their searches were conducted at premises visited by mistake—such as the searches of Televicine Printing shop and Uptown Grocery. At Televicine, after Williams searched in the back of the shop without permission, he showed Occhipinti a printing plate which he took from the premises after Occhipinti said to "seize it." Williams testified that the two often seized cash that was not accompanied by evidence of a crime such as gambling receipts.

Even without the testimony of Agent Williams, this court finds a fair preponderance of the evidence—as illustrated by the witness testimony below—shows the defendant willfully and knowingly became a member of and participated in the civil rights conspiracy.

II. COUNTS 2, 3, 4, 6, 8, 10, 13, 16, 19, 21, and 23—VIOLATION OF CIVIL RIGHTS: SEARCHES AND SEIZURES.

■ These counts charge the defendant with violating 18 U.S.C. § 242, specifically, depriving inhabitants' of rights.

■ In order to establish guilt beyond a reasonable doubt, the Government must prove three elements: 1) that the defendant acted under color of law; 2) that the defendant deprived an inhabitant[2] of his or her Fourth Amendment right against unreasonable searches and seizures; and 3) that the defendant acted willfully. This court finds the evidence sufficient for a

---

**2.** The parties entered into a stipulation in which they agreed that all "the owners of business establishments identified in [the] indictment ... were inhabitants of either ... New York or ... New Jersey" and that Agent Occhipinti never obtained search warrants for the relevant searches nor represented that he had. Tr. 1586; Joint Exhibit 1.

reasonable jury to conclude guilt beyond a reasonable doubt with respect to each of the following 11 counts.

It was stipulated that Agent Occhipinti obtained search warrants for none of the searches charged in the indictment. All of the searches were conducted pursuant to execution of defendant's "consent to search" forms. Practically all of the complainant-witnesses who testified admitted that they signed the consent forms. They also testified that they signed the consent forms after the searches had been completed. The Government contends that consent was not freely and voluntarily given.

Practically all of the complainant-witnesses who testified admitted that they illegally sold Puerto Rican lottery tickets. Defendant alleged that at least some of the searches were predicated on information which led him to believe "gambling" occurred on the searched premises. This information, defendant alleges, was provided by a confidential informant. Agent Williams confirmed the existence of such an informant, however, he stated that he had no knowledge of any specific information provided by this informant with respect to the searches charged in the indictment. Tr. 1841.

Count Two charges defendant with illegally searching and seizing $2,500 cash and other items from Crucey Grocery. Altagracia Crucey, owner of Crucey Grocery, testified that when the INS agents entered the store and asked her if he could search for Freddie Then, she said "yes, ... go ahead and look." She was then given a blank piece of paper and asked to sign it. She signed it "after they had searched the store, just before they left." Tr. 614, 641, 687. Neither did she read it, nor was it read to her. Tr. 641. The agents began searching behind the counter, on the side of the cash register, "underneath the paper bags where I keep money. They threw everything to the floor." Tr. 614–15, 617. She testified that the agents took without permission "some money [including $2,000 in beer money], $500, together with some [gold] jewelry, a chain, and a bracelet that had the Virgin of Altagracia, which is the patron saint of the Dominican Republic." Tr. 617–18.

Count Three charges the defendant with illegally searching Rosario Grocery. Antonio Marte, an employee of Rosario Grocery, identified defendant as one of the three plain clothes officers and two (suited) police officers who appeared at Rosario Grocery. Tr. 366–67. Mr. Marte testified that when he arrived at the store, the police officers were "holding on to the door" and admitted him only after he told them he was an employee. When he entered, he observed defendant and others searching the cash register, counter and shelves. Tr. 367–69, 396. Mr. Marte testified that he did not give permission, although he did sign a form defendant gave to him. Tr. 371–74. He testified that he signed after the search was conducted and that "I did not read it because I considered it to be an official search because the police officials were already inside the store by the door. I felt sure as to what was going on because [defendant] told me that we would meet the next day here at 26 Federal Plaza." Tr. 374–75, 400. Ramon Rosario, also a store employee, testified that he did not give the agents permission to search. Tr. 414–15.

Count Four charges defendant with illegally searching and seizing $12,000 cash and other items from Liberato Grocery. Jose Liberato, owner of Liberato Grocery, testified that in December 1989 two INS agents and two uniformed police officers visited his store. Tr. 751. He described defendant and his partner, Stafford Williams. Defendant told the witness that he had information that illegal aliens worked at the grocery. Defendant ordered the door locked and began questioning customers about their immigration status. Tr. 753–54. Then, Mr. Liberato testified, defendant told him he wanted to discuss something confidential with him in his basement office. He then asked the witness to open his safe: "he insisted, that I had to open it. Because there ... was documentation there, that he was interested in.... And I told him that he must understand that I was not going to keep illegal aliens in the safe." Tr. 754–58. As

soon as the safe was opened, defendant took $12,000 out of the safe. Tr. 759–60. Mr. Liberato testified that he never gave permission for this search. Tr. 759.

Miguel Batista, an employee of Liberato's, testified to the unconsented search of the store itself: that they searched the meat department, where he worked, the cash registers and the customers. He testified that they locked the doors while they searched. Tr. 866–69.

Count Six charges defendant with illegally searching and seizing items at Nurys Travel Service. Nurys Brito, owner of Nurys Travel Service, testified that on January 17, 1990 three immigration officers arrived at her office and asked whether illegal aliens worked there. Tr. 972–73. She testified that the agents searched her files without her permission. Tr. 975–77. She said that she signed the consent form after the search was conducted but did not read the form. Tr. 983–83. She testified: "He told me that it was my address, and he said to sign it, to show that they had been there to investigate." Tr. 984.

Count Eight charges defendant with illegally searching and seizing $6,000 cash and other items from St. Nicholas Auto Parts. Rene Suarez, owner of St. Nicholas Auto Parts, testified that two agents entered the business and told him they "had a complaint that ... someone working there ... was here illegally." Tr. 1174. At that point, an employee ran toward the back of the store and the agents ordered everyone to stand in the middle of the store while they searched them. Tr. 1174–77. They then searched drawers, boxes, and behind the counters while telling Suarez they were looking for illegal aliens. Tr. 1177. Suarez testified that the agents neither requested nor obtained permission to search. Tr. 1178, 1189. Suarez also testified that defendant took approximately $2500 from a metal box in which he held his daily sales revenue. He said there were no gambling slips in this box. Tr. 1179. While he stood in the middle of the store, Suarez testified, defendant took everything from his pockets including his wallet which contained $4,000; Occhipinti returned his belongings. Tr. 1180–81. Mr. Occhipinti had instructed Suarez to unlock the office where he searched him again and took his belongings. After he took the money, Suarez testified, Occhipinti told him he could claim it later. He then took the witness to the 34th precinct in handcuffs, although he was told that he was not under arrest. Afterward, Suarez testified, defendant "wrote on the paper everything that had happened at the place. He asked me to sign. And then he said that I could go." Tr. 1181–84. Another witness corroborated Mr. Suarez's account of the searches. Tr. 1251–54.

Count Ten charges defendant with illegally searching and seizing $4,000 cash and other items from Checo Grocery. Enrique Checo, an employee at Checo's Grocery, testified that three agents visited the store: one stood by the door refusing to let people in or out and the black agent searched the rear of the store while the defendant questioned him. Tr. 1290–91. He testified that defendant asked him where the money and weapons were (the witness said there were none) and then accompanied him to the office and began searching the drawers and files—which he did without permission. Tr. 1291–95. The witness obtained his green card for defendant from a box that held $4,000 which defendant took. Tr. 1296–97. After the black agent collected a pile of documents and placed them inside a cooler, the witness and others were taken to the police precinct where he was later released. Tr. 1299–130. Mr. Checo testified that when he returned to the store, he "found that everything was a mess there ... because they [had] torn down some plywood, and an air conditioner, ... [and] papers, everything was on the floor." Tr. 1302. He never recovered the money. Tr. 1304. Although Mr. Checo signed a form prepared by the defendant, he testified that he does not read English well and did not know what he was signing. Tr. 1310–13.

Count Thirteen charges defendant with illegally searching and seizing $4,000 cash and other items from Medina Grocery. Radhame Leonidas Liberato, owner of Medina Grocery, testified that in March 1990

three agents visited his grocery, including defendant and a "tall black" agent. Tr. 1376. Defendant and his partner indicated they were looking for illegal aliens and began to search behind the counter as Mr. Liberato asked "where are you going if you're looking for illegal aliens?" He testified that he was handcuffed when he tried to stop the agents from searching. Tr. 1378. He then saw the black agent take his money from his coat which totalled approximately $2,000; the money was never returned to him. Tr. 1379, 1382. He testified that the agents also took, without permission, an envelope behind the cash register containing $1,000, $500 underneath the counter, $400 in the coffee grinder, and $150 from the cash register—none of which was accompanied by gambling receipts. Tr. 1383–87. He also testified that he was never given a receipt for the money nor was it counted before the agents left the store. Tr. 1389. Mr. Liberato remembered signing a form but did not remember where. Tr. 1396.

Count Sixteen charges defendant with illegally searching and seizing $6,621 cash and other items from J & M Grocery. Jose Prado, part owner of J & M Grocery, testified that on March 23, 1990, when he arrived at the store, defendant and his partner were searching it and "all of the notebooks were on the floor. And the paper bags were all on the floor.... It was as if a hurricane had passed by." Tr. 1474–75. He testified that when he entered the store, "the [defendant] told me that he was El Jefe, the boss" and that he was looking for illegal aliens. Tr. 1475–76. He had not been asked for permission. Tr. 1503. He also testified that when he reached the store the box in which he locked away approximately $5,000 was opened and empty, with the lock broken. Tr. 1478–79. The agents also took an envelope with $150 in it. None of the money was returned to him even though he testified that none of it was proceeds of illegal gambling. Tr. 1480, 1484, 1518. Mr. Prado stated that defendant, as a receipt for the money, gave him his card on which he wrote the amount $6,260 on the back. Tr. 1487, 1515. Mr. Prado stated that he signed an affidavit

after defendant told him to at the police precinct after the search was over. Tr. 1503–04, 1516. He testified that the money he saw Occhipinti and his partner remove from the cash register was placed in a large paper bag. Tr. 1504–05. Mr. Prado also testified that the agents returned to his store subsequently and that approximately $1,000 was missing thereafter. Tr. 1523–24.

Count Nineteen charges defendant with illegally searching and seizing items at Televicine Printing Company. Miguelina Sanchez, co-manager of Televicine, testified that defendant, with his partner, came into their office reporting he was "looking for Uptown Travel." Tr. 261. While insisting that her office was not Uptown Travel Agency, the witness testified that "the black agent went around me to the back where the presses are." Tr. 262. She testified that neither the black agent who searched nor defendant asked her for permission to search the premises, and permission was not given. Tr. 265. She also testified that she signed no consent form. Tr. 272. Witnesses testified that when Jorge Carmona, an immigration lawyer, asked defendant if he had a search warrant, defendant replied he did not need one because he was a federal agent. Tr. 267, 313. Mr. Carmona testified that he asked defendant to leave "eight to ten times" but he refused. Tr. 316. Ms. Sanchez testified that the black agent brought two metal plates from the back of the store and the two agents took them from the premises without permission. Tr. 268–72; Exhibit 1906. Ms. Sanchez testified that the door to the printing presses is usually locked and was locked the day the INS agents searched. Tr. 276–77.

Count Twenty–One charges defendant with illegally searching and seizing items from Uptown Travel Agency. Raymundo Tejeda, owner of Uptown Travel, testified that his office was searched on March 27, 1990. Tr. 466. He described defendant and his partner, Stafford Williams, as the only two agents who came to his store, Tr. 470, and that defendant gave him his card. Tr. 472. Tejeda testified that the agents

came in and immediately began searching through files and his personal items while they told him they were looking for "illegal aliens, drugs, guns, or money laundering." Tr. 470, 474. "They search[ed] the entire office, all around the office. Well, the drawers that were underneath the desks. The file cabinets, even the ceiling [—removing ceiling tiles]." Tr. 481–82. Tejeda also testified that he did not give defendant permission to search his bag or wallet. Tr. 478–79. "They did not ask me whether they could search or not. They just went on and searched." Tr. 482. He testified that the agents took numerous business documents from his office, in addition to a rolodex, his social security card and a friend's green card. Tr. 483–95; Exh's 2105–A & B. As defendant was leaving, Mr. Tejeda testified, he signed the consent form defendant gave him. Tr. 499; Exh. 2103.

Count Twenty–Three charges defendant with illegally searching the premises of 350 Bowery in New York City. Wai Tak Ng, a special agent with the INS who speaks two Chinese dialects, accompanied Occhipinti to 350 Bowery, an alleged brothel, to act as a translator. Ng testified that he asked the madam of the house twice whether she would give permission to search the premises and she refused. He testified that the refusals made Occhipinti angry and he pointed to Agent Stafford Williams and told Ng to translate to the madam "[i]f she doesn't consent, ... I'm going to have that guy rape her." Tr. 2186. Agent Ng said he refused to translate this and instead walked away from Occhipinti. He said the search began shortly thereafter. Tr. 2187. To his knowledge, the madam spoke only a few words of English.

### III. COUNTS 7, 9, 12, 15, 17, 18, 20, and 22—FALSE STATEMENT.

■ These counts charge defendant with violating 18 U.S.C. § 1001, specifically, making false statements on official documents. There are four elements of this crime.

■ In order to prove that the defendant is guilty of making false statements as charged in these counts, the Government must establish, beyond a reasonable doubt, each of the following essential elements of the crime: 1) that the defendant made a statement or representation; 2) that the statement was false or fictitious or fraudulent; 3) that the false statement was made unlawfully, knowingly, and willfully; and 4) that the statement was made in a matter within the jurisdiction of a department of the United States. This court finds the evidence sufficient for a reasonable jury to conclude guilt beyond a reasonable doubt with respect to each of the following 8 counts.

Count Seven charges defendant with making a false statement in his Memorandum of Investigation, an official INS document—that "Ms. Nurys (sic) consented to a search of her agency and executed the attached consent to search form." Nurys Brito testified that she did not consent to the search and signed the consent form after the search was conducted. Tr. 983–83. She also testified that Occhipinti told her that she must sign the form "to show that [the agents] had been there to investigate." Tr. 984.

Count Nine charges defendant with making a false statement in his Memorandum of Investigation—that "Mr. Suarez–Rojo agreed to a consensual search of said premises and executed at 11:00 am the attached consent to search form." Mr. Suarez testified that the agents neither requested nor obtained permission to search before the search took place. Tr. 1178, 1189. The affidavit and consent form he signed were executed at the police precinct after the search; then, defendant told him where to sign and he signed. Tr. 1186.

Count Twelve charges defendant with making a false statement in his Memorandum of Investigation—that "On the same date at 12:30 pm, Mr. Checo executed the attached consent to search form permitting a consensual search of said premises. A total of $853 in gambling related currency was seized." Mr. Checo testified that he did not consent to the search. Although he signed a form prepared by defendant at the police precinct (after the search), he testified that he does not read English well and

did not know what he was signing. Tr. 1310–13.

Count Fifteen charges defendant with making a false statement in his Memorandum of Investigation—that "On the same date and time, Mr. Liberato consented to a search of his premises and executed the attached form. A search of the front cashier area and back office uncovered numerous gambling records and slips, as well as $1,573 in gambling proceeds." Mr. Liberato testified that he did not give permission for the search and that he signed the consent form after the search was completed, just before the agents left the grocery. Tr. 759, 783–84.

Count Seventeen charges defendant with making a false statement in his Memorandum of Investigation—that "On the same date at 8:00 am, Mr. Rodriguez and Mr. Mendez consented to a search of said premises and executed the attached form." Mr. Rodriguez testified that he worked a total of two months at J & M Grocery. He remembered signing a piece of paper given him by the agents but did not know what it was. He testified that Mr. Mendez was 18 years old and that he was unaware how long he had worked there. Rodriguez testified that he did not give the agents permission to search. Tr. 1601–08.

Count Eighteen charges defendant with making a false statement in his Memorandum of Investigation—that "A search of the premises uncovered one illegal alien employee, later identified as Demetrio Espinoza Martinez, the seizure of gambling records and $495 in gambling proceeds." Rafael Roque, an employee of Yeya Supermarket, testified that, of the $495 vouchered by Agent Occhipinti the day he searched the grocery, $404 of that amount was money the owner left for him to pay for milk and Tropicana products and, therefore, could not have been gambling proceeds. Tr. 1655–57, 1693. He also testified that defendant did not give him a receipt for the money he took. Tr. 1658.

Count Twenty charges defendant with making a false statement in his Memorandum of Investigation—that "Ms. Sanchez gave verbal permission to search the premises." Ms. Sanchez testified that she neither gave permission to the agents to search, nor did they ask for permission, and that "the black agent" began searching as she spoke to defendant soon after the two entered the store. Tr. 262, 265.

Count Twenty–Two charges defendant with making a false statement in his Memorandum of Investigation—that "On the same date at 3:45 pm, Mr. Tejeda executed the attached service form ... permitting a consensual search of said premises." Mr. Tejeda testified that he did not give defendant permission to search. Tr. 478–79. "They did not ask me whether they could search or not. They just went on and searched." Tr. 482. Mr. Tejeda testified that he signed the consent form Occhipinti gave him as defendant was leaving—after the search occurred. Tr. 499.

## IV. COUNTS 5, 11 and 14— EMBEZZLEMENT and CONVERSION.

 These counts charge defendant with violating 18 U.S.C. § 654, specifically, "embezzl[ing] or wrongfully convert[ing] to his own use the money or property of another" which came into his possession while performing his duties as an INS agent. There are three elements of this crime.

 In order to prove that defendant is guilty of embezzlement as charged in these counts, the Government must establish, beyond a reasonable doubt, each of the following essential elements of the crime: 1) that the defendant was an officer or employee of the United States or a department or agency thereof; 2) that he embezzled or wrongfully converted to his own use the money or property of another; and 3) that the money or property came into his possession in the execution of his employment, or under color or claim of authority as such an employee. There was no dispute that Agent Occhipinti was an employee of the INS, a department of the U.S. Department of Justice. The witnesses testified that defendant represented himself as an INS agent investigating reports of illegal aliens. This court finds evidence sufficient for a reasonable jury to conclude guilt beyond a reasonable doubt with respect to the following 3 counts.

Count Five charges defendant with embezzling $10,200 cash from Liberato Grocery. Mr. Liberato testified that he had approximately $12,000, all of which defendant removed from the safe when he searched and that this money was never receipted nor returned to him. Tr. 760, 787–88. He also testified that Occhipinti told him "he was going to take it, and if I wanted to claim that money, to go to the precinct, to the police to claim it. But if I went, he was going to keep me in jail." Tr. 788.

Count Eleven charges defendant with embezzling approximately $3,147 cash from Checo Grocery. Enrique Checo testified that defendant took $4000 from a box in which he kept money for store purchases. Tr. 1296–97. He said he never recovered the money. Tr. 1304. Checo testified that he signed a form prepared by defendant, even though he does not read English well and did not know what he was signing. Tr. 1310–13.

Count Fourteen charges defendant with embezzling approximately $2,463 from Medina Grocery. Mr. Liberato testified that the agents took over $4,000 from his store without his permission, never gave him a receipt, nor returned the money. Tr. 1379–89.

## CONCLUSION

For the afore-mentioned reasons, defendant's motion for judgment of acquittal is denied as to all counts. Additionally, pursuant to *Geaney* and on the basis of the independent evidence presented by the Government on its direct case and recited in this opinion, this court finds that Occhipinti knowingly and willfully became a member of and participated in the civil rights conspiracy charged in Count 1 of the indictment. Accordingly, pursuant to *Geaney,* co-conspirator declarations may be considered by the jury against the defendant with respect to the conspiracy charged.