UNITED STATES of America, Plaintiff,

v.

Mario BIAGGI, Stanley Simon, Peter Neglia, John Mariotta, Bernard Ehrlich, Richard Biaggi, and Ronald Betso, Defendants.

87 Cr. 265 (CBM).

United States District Court,
S.D. New York.

June 27, 1988.

Rudolph W. Giuliani, U.S. Atty., New York City by Howard Wilson, Edward J.M. Little, Mary T. Shannon, Asst. U.S. Attys., S. Alexander Planzos, Sp. Asst. U.S. Atty., for U.S.

LaRossa, Mitchell & Ross, New York City by James M. LaRossa, for defendant Mario Biaggi.

Kramer, Levin, Nessen, Kamin & Frankel, New York City by Maurice N. Nessen, David Seide, for defendant Stanley Simon.

Kevin P. McGovern, Brooklyn, N.Y., for defendant Peter Neglia.

Skadden, Arps, Slate, Meagher & Flom, New York City by Jeffrey Glekel, David H. Hennessy, for defendant John Mariotta.

Kostelanetz, Ritholz, Tigue & Fink, New York City by Peter J. Driscoll, Catherine Redlich, for defendant Bernard Ehrlich.

Dominick F. Amorosa, New York City, for defendant Richard Biaggi.

Buchwald & Kaufman, New York City by Alan R. Kaufman, for defendant Ronald Betso.

## MEMORANDUM OPINION

MOTLEY, District Judge.

The court hereby makes its finding pursuant to *United States v. Geaney*, 417 F.2d 1116 (2d Cir.1969), as to each defendant in the above-captioned case.

In making its *Geaney* findings, the court begins by observing that two elements of a RICO conspiracy apply generally to these defendants: the existence of an enterprise, as defined by the RICO statute, and the effect of that enterprise on interstate or foreign commerce. The court finds that the Government has introduced a fair preponderance of evidence, excluding hearsay statements admissible only under the coconspirator exception, that both of these elements are satisfied. The Wedtech Corporation, as a corporation, comes under the statutory definition of an "enterprise," and there is sufficient evidence to show that, through its dealings with the SBA and the Department of Defense as a Section 8(a) company, in competition with Section 8(a) companies operating in other states, the Wedtech Corporation affected interstate commerce. There was, moreover, undisputed testimony from a number of the cooperating witnesses that the Wedtech Corporation affected foreign commerce, as through its ownership of its Israeli subsidiary Carmo Industries, and as through the trip through England and Italy to arrange kickbacks from companies in those countries testified to by Mario Moreno.

The remaining elements of a RICO conspiracy count—association with the enterprise and agreement to conduct the affairs of the enterprise through a pattern of racketeering activity consisting in the commission of at least two of the racketeering acts alleged in the indictment—require specific application to the individual defendants, to which this court now proceeds.

## CONGRESSMAN MARIO BIAGGI

The court finds proof of the third element of Count Two—association with the enterprise—in the following evidence. There was considerable testimony that congressman Biaggi assisted Wedtech in many ways. Senator Alphonse D'Amato testified that Congressman Biaggi had contacted him to help obtain contracts for Wedtech. There was other testimony that Congressman Biaggi contacted the late Congressman Joseph Addabbo on Wedtech matters, and helped to set up meetings between

Wedtech officers and both Congressman Addabbo and Senator D'Amato. There was testimony that Congressman Biaggi helped persuade the Economic Development Administration (EDA) to accept the subordination arrangement with Bank Leumi that enabled Wedtech to arrange financing for the most lucrative defense contract it obtained, the so-called pontoon contract. The Congressman's help with EDA matters extended even to the relatively trivial example of permitting Messrs. Ehrlich and Moreno to use a helicopter in his name to deliver documents on a rush basis to the EDA in Philadelphia.

The testimony is that when Wedtech had difficulty meeting its deadline on the $500,000 loan it allegedly obtained from Pat Simone, the Congressman was instrumental in negotiating an extension of the deadline. The Government has introduced evidence that the Congressman was also instrumental in Wedtech's efforts to secure the parking lot at One Loop Drive: that he was in touch with Susan Frank, that Comptroller Harrison Goldin changed his position on One Loop after talking to Congressman Biaggi, that the Congressman expended considerable effort to placate Queens Borough President Donald Manes for the loss of jobs in Queens the One Loop package would entail, and that he put pressure on Bronx Borough President Simon to act as a strong advocate of the One Loop deal rather than a passive supporter. Further, the cooperator Mario Moreno testified that when he told the Congressman of Congressman Parren Mitchell's investigation of Wedtech, Congressman Biaggi replied that he and Congressman Mitchell were friends of long standing and that he would "see what he could do." Finally, Moreno also testified that in Wedtech's waning days Congressman Biaggi tried to arrange credit for Wedtech through his personal contacts with Teamsters President Jackie Presser, the limousine entrepeneur Bill Fugazy, and Chrysler Board Chairman Lee Iaccocca.

The court finds that these efforts to help Wedtech, particularly in conjunction with other evidence to be recounted below, are sufficient to show Congressman Biaggi's association with the enterprise.

There is a fair preponderance of evidence, excluding hearsay admissible only under the coconspirator exception, to show that Congressman Biaggi agreed to violate § 1962(c) by committing at least two racketeering acts.

▪ First, there is a fair preponderance of evidence that Congressman Biaggi agreed with at least Richard Biaggi, Ehrlich, Moreno, Guariglia, Shorten, and Neuberger to defraud the Department of Defense by executing the sham stock purchase agreements. This fair preponderance includes hearsay statements that are admissible under an exception other than Rule 801(d)(2)(E). This is, however, perfectly legitimate for *Geaney* purposes. *United States v. DeJesus*, 806 F.2d 31, 35 (2d Cir.1986), *cert. denied*, 479 U.S. 1090, 107 S.Ct. 1299, 94 L.Ed.2d 155 (1987). Here, as in *DeJesus*, "Under [Rule 803(3) ], hearsay statements reflecting a declarant's intentions or future plans are admissible to prove subsequent acts." *DeJesus*, 806 F.2d at 35. Here, Mario Moreno testified to such a statement of future plan by Congressman Biaggi. Moreno testified that Congressman Biaggi said he would approve the stock purchase agreement—that is, that he would allow stock purchase agreements to be executed between Richard Biaggi and Ehrlich and John Mariotta, but only under certain conditions. Those conditions were an accelerated due date for the first installment and a one-year payout instead of a ten-year payout. Under *DeJesus* these statements are admissible to prove a subsequent act—Congressman Biaggi's participation in a fraudulent scheme. Moreover, the various stock purchase agreements are in evidence, and the agreements executed by Richard Biaggi and Ehrlich indeed differ from the cooperators' in essentially the respects Congressman Biaggi is supposed to have specified. The difference is that the payout is to occur in two installments, not all at once, and Moreno testified that the Congressman was induced to agree to this change. Thus documentary evidence, in the form of the differ-

ing stock purchase agreements, along with admissible hearsay, allow the inference that Congressman Biaggi agreed to the stock purchase fraud.

Second, there is a fair preponderance of evidence that Congressman Biaggi agreed with at least Moreno, Mariotta, Guariglia, Shorten, and Neuberger to accept $50,000 in the guise of a payment to Biaggi & Ehrlich for legal services. The documentary evidence, consisting of the Biaggi & Ehrlich invoice and the Wedtech check, is significant: the invoice is dated June 19, 1984, after Ehrlich's and Carlos Cuevas Jr.'s marathon June 4 workday that resulted in Susan Frank's June 5 letter of intent, and the check is dated July 13, 1984, the day after the Board of Estimate meeting at which Wedtech's application for the One Loop variance was approved. There was nonhearsay testimony that Wedtech did not owe Biaggi & Ehrlich anything at the time on its retainer. There was nonhearsay testimony from Carlos Cuevas, Jr. that Biaggi & Ehrlich essentially began to represent Wedtech in the One Loop matter on June 4 (reinforced by his account of the discussions of Biaggi & Ehrlich's conflict of interest in representing both Wedtech and Freedom Industries), from which one could conclude that Biaggi & Ehrlich could not possibly have done enough legal work on One Loop to bill Wedtech for $50,000 on June 19. These facts are consistent with the uniform testimony of the cooperators: Moreno, Shorten, and Guariglia characterized the $50,000 as a "bonus" for Biaggi & Ehrlich's work on One Loop, presumably with specific reference to Ehrlich and Cuevas's efforts. Crucial, however, is the fact that the check is dated the day after the Board of Estimate meeting, giving rise to the inference that it was actually a payment for promised services in connection with that meeting.

The link with Congressman Biaggi comes in his statement, reported by Moreno, that the $50,000 wasn't really very much money for all *he* did on One Loop, in particular having to placate Donald Manes for the loss of jobs occasioned by Hebrew National's moving out of Queens to One Loop. This statement implies that the money was

payment for his services, not Ehrlich's or Cuevas's, and that those services were to be rendered after the invoice was issued; it even permits the inference that the invoice was issued; it even permits the inference that the invoice was issued at the direct instigation of Congressman Biaggi. The principle of *DeJesus*, that in a *Geaney* finding the court excludes *only* coconspirator hearsay that would be admissible only under Rule 801(d)(2)(E), must again apply. For the statement is one of Congressman Biaggi's own, and therefore comes in as an admission under Rule 801(d)(2)(A).

Third, although the matter is closer, there is a fair preponderance of evidence that Congressman Biaggi agreed with at least Moreno, Neuberger, and Mariotta to receive 5% of Wedtech stock in the names of Ehrlich and Richard Biaggi. Apart from the existence of the stock certificates themselves, the evidence of Congressman Biaggi's participation in the stock issuance rests in two sets of his conversations: at a meeting with Moreno, Mariotta, and Neuberger in which the latter three agreed to give him the 5%, and in a meeting in Spring 1983 in which he is said by Irwin Wolf to have determined that the only viable way of issuing the stock was to do it in Richard Biaggi's name.

Both sets of conversations are admissible independently of Rule 801(d)(2)(E). With respect to the stock issuance, the import was "Biaggi & Ehrlich has done a tremendous amount for you; for example, you would never have gotten the small engine contract without Ehrlich's efforts. Yet see how you treat us. You promised us this stock a long time ago and you still haven't delivered." As reported by Moreno, Congressman Biaggi also made the veiled threat, "I can wreck this company as easily as I made it." These statements are admissible as admissions of the Congressman.

Irwin Wolf's testimony is also probative. Wolf recounted that he explained the consequences of the various options the participants at the meeting were considering for the issuance of the stock, and reports that he seems to remember that it was Con-

gressman Biaggi who said, at the conclusion of this presentation, that the only viable option was to put the stock in his son's name. This is, at least by implication, an admission that he, Congressman Biaggi, was the true owner of the stock; the purpose of the meeting was to devise a way of disguising that fact. Thus, this statement would be admissible under (d)(2)(A) as well. Irwin Wolf's statements at the meeting are admissible pursuant to Rule 801(d)(2)(B) and to provide the context for the Congressman's statements.

Fourth, there is evidence to prove by a fair preponderance that Congressman Biaggi tacitly agreed not to reveal his or others' participation in the unlawful schemes described above and therefore that he tacitly agreed to obstruct justice. The evidence of this agreement lies in the excerpts from the Congressman's deposition, taken ancillary to the grand jury proceedings, now in evidence. During that deposition, the Congressman stated that he had no recollection of contacting anyone in the Government about Wedtech apart from having written four letters in 1978. The evidence introduced at trial suggests that this statement was false. In addition, Congressman Biaggi's willingness to join the Wedtech officers in making material misrepresentations to the Government about Wedtech stock ownership, indicates that he tacitly agreed with them not to reveal the truth about his involvement with Wedtech.

The preceding is sufficient to allow Rule 801(d)(2)(E) statements to come in against Congressman Biaggi, for it shows his agreement to commit at least two racketeering acts, and thus his engagement in a conspiracy to violate § 1962(c).

## STANLEY SIMON

The first two elements of Count Two have already been addressed.

As to the defendant Stanley Simon's association with the enterprise, the court finds that the Government has introduced sufficient evidence to prove this element. In particular, the following evidence that Simon assisted Wedtech in its effort to lease the parking lot at One Loop Drive and the evidence that in exchange for that service Wedtech disbursed some $50,000 at his behest from the F.H.J. account adequately shows association for the present purposes.

Mario Moreno, Ceil Lewis, Lawrence Shorten, and Fred Neuberger all testified that Simon solicited $50,000—originally $100,000, according to some testimony— from Neuberger at a benefit for the Hebrew Home for the Aged at Yonkers Raceway. Chris Gaylord, then in charge of bookings at Yonkers Raceway, offered evidence that the benefit took place on June 20, 1984. This would have been in the midst of Wedtech's efforts to obtain the parking lot at One Loop Drive—after Susan Frank's June 5 letter of intent to grant Wedtech the variance it needed, but before the July 12 Board of Estimate meeting at which the variance was approved. There was evidence from Fred Neuberger that the agreement to give Simon $50,000 was a *quid pro quo* for future efforts to help Wedtech obtain One Loop. Neuberger's testimony, both before the grand jury and on direct, was that he had first asked Susan Frank, who was at the Yonkers Raceway benefit, how the One Loop effort was going, and that Simon pulled him aside and said "Don't ask her about it, myself or my office will take care of it." Asked point-blank, Neuberger said he agreed to give the $50,000 because they needed Simon's help on One Loop, and "who knows what ... other—shall we say favors." Although on cross-examination Neuberger said that Simon did not threaten him or Wedtech, this direct solicitation meets the criteria for extortion under color of official right.

There was extensive testimony that Simon helped Wedtech with One Loop at two different times. Before the meeting at Yonkers, on June 4, he helped arrange the meeting that resulted in Susan Frank's June 5 letter of intent. After Yonkers, he was a strong advocate of Wedtech at the July 12 meeting at which the Board of Estimate approved the One Loop lease.

Moreover, there was testimony by Mario Moreno and Carlos Cuevas, Jr. that Simon helped or promised to help Wedtech after

the solicitation, in other ways, as with its attempt in late 1984 or early 1985 to acquire a building at Brown Place.

As to the fourth element of Count Two, there is a fair preponderance of evidence, excluding hearsay admissible only under the coconspirator exception, to show that Simon agreed to violate § 1962(c) by committing at least two racketeering acts.

As to Racketeering Act Four, there was an agreement between Simon and Neuberger to give Simon $50,000 in Wedtech funds. The fact that Stanley Simon was Bronx Borough President at the time the alleged racketeering acts occurred is not in dispute. The principal documentary evidence for this agreement is of three kinds: (a) F.H.J. checks; (b) the invoices that correspond to them; (c) the F.H.J. tally sheets kept by both Ceil Lewis and Anthony Guariglia, and used in their testimony to match checks to invoices. None of these are hearsay. The checks and invoices are what they are, simply checks and invoices. They are not even the kind of thing that could be offered for their truth. Thus, where they were matched by noncracketeers (such as Jack McQuade for Bernstein's on Essex, Edward Ehring for Ehring's Tavern, and Danny Stomatovic for American–European Luncheonette), there is no question that they are admissible.

However, even when they were matched by Ceil Lewis and Anthony Guariglia, there is no question that they are admissible. For, again, the checks are first of all not hearsay. Second, Ceil Lewis testified about what *she* did, in her role as custodian of the F.H.J. account—giving Ralph Lawrence blank checks and reimbursing herself from F.H.J., among other things. Though she is a coracketeer, most of her testimony against Simon is not hearsay and so not subject to objection. Similarly, Guariglia testified that he, himself, reviewed the four F.H.J. checks that, according to his ledgers, relate to Simon.

There was also considerable testimony that Stanley Simon actually received benefits from Wedtech. Ceil Lewis testified to disbursements, direct and indirect, from the F.H.J. account to Simon, and the relevant checks were introduced through her. Anthony Guariglia also testified as to four F.H.J. checks. Mario Moreno testified to giving Simon cash and chips for gambling, and allowing him to use his comps, on trips to Atlantic City. Various restaurant personnel, caterers, etc., testified that Simon or organizations related to him, such as the Riverdale Democratic Club, incurred expenses paid for with what Ceil Lewis testified were F.H.J. funds, and what were not, in any case, checks drawn on Simon's account. The evidence that Simon was actually given these benefits is additional evidence that he agreed to receive them.

As to Racketeering Act Three, there was an agreement between Simon and Mario Moreno to give Henry Bittman a job and raises at Wedtech. Bittman's Wedtech personnel file, setting forth his salary increases, was introduced into evidence by the Government. Through Alfred Rivera, the folders of a variety of other Wedtech personnel were introduced, and even if Rivera's and Harry Tavitian's testimony about their qualifications and responsibilities were excluded, one could see that Bittman was simultaneously among the highest-paid and least qualified Wedtech employees.

However, there is no need to exclude Rivera's or Tavitian's testimony. For again, they did not testify as to conversations. They testified as to Bittman's relative qualifications and job performance. Each had direct supervision over Bittman at different times, and so were perfectly competent witnesses on this topic. Each gave specific nonhearsay examples of Bittman's performance, supporting their opinion that he was incompetent. That opinion provides enough circumstantial evidence to allow an inference that Bittman's salary increases had some explanation other than merit, such as an agreement between Simon and Moreno that violates § 1962(c).

Finally, the court finds that the Government has introduced adequate evidence to show by a fair preponderance that Stanley Simon agreed to commit Racketeering Act Sixteen. That racketeering act alleges that on February 26, 1987, Simon made false statements to the grand jury investigating

this case. The portion of the transcript of that proceeding now in evidence shows that Simon categorically denied receiving, being offered, or soliciting, cash, a gift, or anything of value, either directly or indirectly, in connection with his official duties as a Borough President of the Bronx. The evidence described at length above suggests that this denial was false and that Simon knew it. That evidence also tends to show that Simon, at least tacitly, agreed with the Wedtech officers not to reveal the corrupt nature of his involvement with them.

In consequence, this court holds that the requirements of *United States v. Geaney* as to Simon's participation in the alleged RICO conspiracy are satisfied, and the hearsay declarations of his coconspirators admissible only under Federal Rule of Evidence 801(d)(2)(E) are admissible against him.

## PETER NEGLIA

■ The first two elements of RICO conspiracy—the existence of the enterprise and its effect on interstate commerce—have already been addressed.

The third element—association with the enterprise—is amply demonstrated by testimony regarding Wedtech's dealings with defendant Neglia while he was the SBA's Regional Director for New York and the Acting Chief of Staff for its Washington D.C. office. There has also been testimony that defendant Neglia attended lunches and dinners, the 1985 inaugural festivities, and other Republican fundraising events with Wedtech officers, at the company's expense.

The independent evidence of the fourth element—unlawful, knowing, willful agreement to participate in the conduct of Wedtech's affairs by agreeing to perform two or more of the racketeering acts listed in Count One through a pattern of racketeering—is as follows.

Peter Neglia is charged with committing five racketeering acts: 1) mail fraud by aiding and abetting the submission of sham stock purchase agreements, 2) receipt of a $4500 bribe or a $3000 gratuity, 3) receipt of an option for 20,000 shares of stock as a

bribe or gratuity, 4) seeking half of his salary at Biaggi & Ehrlich from Wedtech as a bribe or gratuity, and 5) making false statements to a DOD agent. *Geaney* requires that evidence admitted other than by means of Rule 801(d)(2)(E) show by a fair preponderance that Peter Neglia agreed to commit two or more of these racketeering acts through a pattern of racketeering activity.

Racketeering Act Six charges that from mid–1983 until February 1986, Peter Neglia committed mail fraud against the Department of Defense (DOD) by submitting sham stock purchase agreements to the SBA in Washington D.C. The following independent evidence proves by a fair preponderance that Neglia agreed to commit this racketeering act.

Mario Moreno testified about a meeting during which Peter Neglia agreed to discuss with SBA attorneys and officials the various alternatives Wedtech devised as ways to be recertified under the 8(a) program after Wedtech's public offering placed it in technical default. Mario Moreno also testified to a meeting after the stock purchase agreements had been executed in which Peter Neglia asked Ehrlich how he could trust John Mariotta in transfering his stock given Mariotta's earlier behavior. Peter Neglia's question suggests that Neglia not only knew the content of the stock purchase agreements but understood that Mariotta was expected to default on the stock purchase agreements. It is therefore evidence that Peter Neglia agreed to process the stock purchase agreements through the SBA knowing that they were sham agreements. Neglia's statements are independently admissible pursuant to Rule 801(d)(2)(A). Various correspondence about the stock purchase agreements, including Peter Neglia's memorandum recommending that Wedtech be granted an extension in the program (GX171), is in evidence pursuant to Rule 803(6). This evidence and testimony that Wedtech was granted the extension after submission of the stock purchase agreements is also evidence that Peter Neglia in fact committed the fraud against DOD by

mailing the stock purchase agreements to the SBA in Washington D.C. The evidence of actual commission of the fraud is additional evidence that he agreed to commit the fraud.

Racketeering Act Eight charges Peter Neglia with receipt of a $4500 bribe or a $3,000 gratuity in the form of money to be paid on his behalf to Republican organizations. The following independent evidence shows by a fair preponderance that Peter Neglia agreed to commit this racketeering act.

Mario Moreno testified that GX313A, a $2,000 check dated June 8, 1984 was given to Bernard Ehrlich to be delivered to Joseph Neglia to cover memberships in the Inner Circle for Moreno and Peter Neglia. Moreno testified that he attended an Inner Circle event at which Peter Neglia was present.

Karen Simon testified that she received two $1,000 Banco Popular bank checks in payment for 1984 Empire Club memberships for Peter Neglia and Joseph Neglia. Copies (GX317J-3, 317J-4) and originals of the checks (GX720Y-1) were admitted pursuant to Rule 803(6). Another witness testified that the bank checks were purchased with an F.H.J. check (GX720Y), which is also in evidence pursuant to Rule 803(6). GX317E shows deposits credited to Peter Neglia and Joseph Neglia and GX317E-1 shows that Peter Neglia, Joseph Neglia, Mario Moreno, and Bernard Ehrlich were scheduled to sit together at the 1984 dinner-dance funded by the contributions. These exhibits were also admitted as business records.

There was also testimony that Anthony Guariglia paid $2,500 for tickets to a dinner-dance conducted by the Empire Club in 1985. The check was admitted in evidence as was a letter from Joseph Neglia directing that the money, in conjunction with a $500 check from Biaggi & Ehrlich, be applied to Peter Neglia, Joseph Neglia, and Mario Moreno. (GX317A, 317A-1, 317A-3.) All three of these exhibits were admitted pursuant to Rule 803(6). Likewise GX317F, 317F-1, and 317G, listing deposits, dinner-dance ticket numbers, and seating arrangements for the event, are evidence that the checks were deposited and credited to dinner-dance tickets for Peter Neglia, his father, and friends.

That Peter Neglia obviously knew that he did not himself pay for either his 1984 membership in the Inner Circle or his tickets to the 1984 and 1985 dinner-dances is evidence that he knew they had been paid for by the Wedtech people with whom he attended the Inner Circle event and was scheduled to sit at the Empire Club dinner-dances both years. The fact that Joseph Neglia is Peter Neglia's father suggests that Joseph Neglia acted as Peter Neglia's agent or with Peter Neglia's knowledge and consent. The timing of the payments suggests that Peter Neglia could have agreed to accept them either as a bribe or as a gratuity.

Racketeering Act Nine charges that during 1985, Peter Neglia demanded and received an option for 20,000 shares of Wedtech stock as a bribe or gratuity. The following independent evidence proves by a fair preponderance that Peter Neglia agreed to commit this act.

Several Government witnesses testified that Peter Neglia attended the 1985 inaugural festivities at Wedtech expense. Mario Moreno testified to a conversation over that weekend with Peter Neglia and Bernard Ehrlich regarding giving shares or options to Peter Neglia from Wedtech. They discussed problems involved in giving either stock or options. Peter Neglia said he would look for somebody in whose name he could put options and informed Mario Moreno on at least two separate occasions that he had chosen Ronald Betso. Peter Neglia's statements are admissible under Rule 801(d)(2)(A). Mario Moreno and Bernard Ehrlich's statements are admissible under Rule 803(3) to show their intention to obtain the stock options for Peter Neglia, under Rule 801(d)(2)(B) as adopted admissions, and to provide context for Neglia's statements. *See United States v. DeJesus*, 806 F.2d 31, 35 (2d Cir.1986). Lawrence Shorten testified that after Mario Moreno's conversation with Peter Neglia and Bernard Ehrlich over the inaugural weekend,

Neglia thanked him for what Wedtech was doing for him. The Government also introduced the Rolodex belonging to Mario Moreno's secretary, which included a card recording Ronald Betso's social security number (GX341); the Minutes of the Board of Directors' meeting at which the options for Ronald Betso were approved (GX327A); and an unexecuted copy of the Stock Option Agreement (GX328) under Rule 803(6). These exhibits are evidence that Wedtech actually approved and issued the options. Several witnesses testified that Ronald Betso was not a consultant for Wedtech, as he was described on the Minutes and the Option Agreement. Since one could infer that Wedtech would not have issued and approved the options without the consent of Peter Neglia, the documents are also evidence of an agreement. Moreno also testified that Peter Neglia asked him to hold onto the Option Agreement and later asked him to destroy it. These requests show guilty knowledge. The timing of the discussion, Peter Neglia's higher position and presumably increased influence in the SBA at this time, and his assistance to Wedtech over the years are independent evidence that Peter Neglia agreed to accept the options as either a bribe or a gratuity.

Racketeering Act Ten charges that during 1985, Peter Neglia sought half of his salary at Biaggi & Ehrlich as a bribe or gratuity. The following independent evidence proves by a fair preponderance that Neglia agreed to commit this act.

Mario Moreno testified to a conversation with Ehrlich in Peter Neglia's presence over the inaugural weekend, in which Ehrlich confirmed Wedtech's promise to pay half of Neglia's salary at Biaggi & Ehrlich when Neglia left Government service. Bernard Ehrlich's statement is admissible under Rule 803(3) to show his intent to assist Neglia in obtaining from Wedtech half of Peter Neglia's future salary and under Rule 801(d)(2)(B) because under the circumstances, Peter Neglia had an opportunity and reason to protest the promise, and he did nothing. This conversation occurred early enough so that the agreement to pay the salary might well have been made to influence Peter Neglia's official performance. There was evidence that Peter Neglia became of counsel to Biaggi & Ehrlich when he left the SBA. This independent evidence proves by a fair preponderance that Neglia agreed to solicit half of his salary at Biaggi & Ehrlich as a bribe or gratuity from Wedtech.

Racketeering Act Seventeen charges that on October 24, 1986, Peter Neglia obstructed justice by making false statements to a Special Agent from DOD's Criminal Investigative Service (DCIS). The following independent evidence proves by a fair preponderance that Neglia agreed to obstruct justice.

An agent for DCIS testified that on October 24, 1986, Neglia appeared at the federal courthouse pursuant to a grand jury subpoena issued in connection with the present case, that the agent interviewed Peter Neglia in a room outside the grand jury room, and that the agent discussed the subpoena with Neglia. The agent stated that Neglia told him that he (Neglia) could not recall the specifics of the stock ownership agreement that John Mariotta entered in order to establish his 51% ownership of Wedtech after the company went public. Peter Neglia also represented to the agent that after Neglia left the SBA, he discussed obtaining a job with Biaggi & Ehrlich. The agent said Neglia mentioned no discussions he had about the job before he left the SBA. The agent said that Neglia claimed not to have spoken to Bernard Ehrlich about Wedtech stock and that Bernard Ehrlich never mentioned that he owned Wedtech stock. This testimony and testimony by other witnesses suggests that Neglia actually made false statements to the DCIS agent. The evidence that Peter Neglia made false statements to the DCIS agent combined with independent evidence that Neglia participated in other schemes to deceive the Government provides a sufficient basis for this court to find a tacit agreement that, if asked, Peter Neglia would not truthfully disclose the full extent of his involvement with Wedtech.

In sum, there is sufficient independent evidence to prove by a preponderance that Peter Neglia agreed to perform all of the

racketeering acts with which he is charged. The similar motive and common participants and victims in several of these acts, as well as evidence that Peter Neglia knew that the acts were part of Wedtech's ongoing criminal activities and that he performed them in furtherance of Wedtech's affairs and objectives, provide evidence that he agreed to participate in the conduct of Wedtech through a pattern of racketeering activity. The Government has introduced the independent evidence necessary for a finding that Peter Neglia participated in the RICO conspiracy. Therefore, hearsay statements admitted pursuant to Rule 801(d)(2)(E) subject to connection may be considered by the jury against Peter Neglia.

## JOHN MARIOTTA

██ The first two elements have been addressed.

The third element is abundantly proved by testimony and documentary evidence and testimony that John Mariotta was at various times the founder, president, Chief Executive Officer, and Chairman of the Board of Wedtech.

The independent evidence of the fourth element—unlawful, knowing, willful agreement to conduct Wedtech's affairs through a pattern of racketeering by agreeing to commit two or more of the racketeering acts listed in Count One—is as follows.

John Mariotta has been charged with committing eight racketeering acts: 1) mail fraud by mailing false Personal Financial Statements for 1981 and 1982, 2) mail fraud by executing sham Stock Purchase Agreements, 3) mail fraud by using the F.H.J. Associates checking account, 4) bribing Stanley Simon with $50,000, 5) giving Congressman Biaggi 5% of Wedtech's stock as a bribe or gratuity, 6) giving Congressman Biaggi a $50,000 bribe, 7) giving $3,000 to Peter Neglia's designee as a bribe or gratuity, and 8) giving Peter Neglia an option for 20,000 shares of Wedtech stock as a bribe or gratuity. This court has dismissed the racketeering act alleging mail fraud through use of the F.H.J. account and the Government has withdrawn the racketeering act alleging that Mariotta gave $3,000 to Peter Neglia. *Geaney* requires that evidence admitted other than by means of Rule 801(d)(2)(E) show by a fair preponderance that John Mariotta agreed to commit two or more of the remaining racketeering acts through a pattern of racketeering activity.

Racketeering Act Five charges that from 1981 until June 1983 John Mariotta committed mail fraud against DOD by mailing, among other things, false Personal Financial Statements (PFSs) for 1981 and 1982. John Mariotta's PFSs for 1981 and 1982 are admitted pursuant to Rule 803(6). (GX128 and GX132) There was testimony by an SBA official that both documents were submitted to the SBA as part of the documentation required for obtaining the Fixed Program Participation Term extension and that without the extension Wedtech could not have obtained defense contracts set aside for the 8(a) program. There was testimony that Wedtech was granted the extension. Therefore, DOD was deprived of its control over how its money was spent because of the submission of the false PFSs. GX128 states that John Mariotta's ownership is ⅔ and GX132 states that John Mariotta owns 66% of Wedtech's stock. Testimony by Mario Moreno and Fred Neuberger indicated that John Mariotta owned only 45.5% of Wedtech stock at the time John Mariotta signed those documents. The Government also introduced two executed agreements, dated August 21, 1981 and prepared by Delson & Gordon, which establish and confirm stock ownership by John Mariotta, Fred Neuberger, and Mario Moreno in the ratio of 45.5%/45.5%/9% respectively (GX126A, B). The lawyer who drafted the agreements testified that they had been executed on the dates stated on the agreements. Mario Moreno testified that Mariotta, Neuberger, and Moreno agreed not to reveal the agreements to the SBA because disclosure would result in termination of Wedtech as a participant in the 8(a) program. John Mariotta's statement is admissible pursuant to Rule 801(d)(2)(A) and the statements of Neuberger and Moreno are admissible pur-

suant to Rule 801(d)(2)(B). Between the testimony regarding the explicit agreement and the evidence of the actual commission of mail fraud, there is plenty of independent evidence of an agreement by John Mariotta to commit this act of mail fraud. Racketeering Act Six charges that from mid–1983 until about February 1986, John Mariotta committed mail fraud against DOD by executing sham stock purchase agreements. The following independent evidence clearly shows that John Mariotta agreed to commit mail fraud by executing sham stock purchase agreements.

There was testimony from a number of witnesses about several meetings attended by John Mariotta at which John Mariotta promised to default on the stock purchase agreements. GX163A and GX163C–2 are executed copies of the stock purchase agreements, the first transfering stock from Fred Neuberger, Mario Moreno, Anthony Guariglia, and Lawrence Shorten to John Mariotta and the second transfering stock from Bernard Ehrlich and Richard Biaggi to John Mariotta. The Government also introduced the associated Escrow Agreements (GX163B, 163D). Copies of Rescission Agreements, whereby John Mariotta returned the stock in a fashion designed to avoid the negative tax consequences that would have been incurred by the sellers upon a default, are in evidence pursuant to Rule 803(6). These agreements were executed between the aforementioned parties on December 17, 1985, only weeks before John Mariotta was scheduled to default on the first payment. Documents in evidence show that the stock purchase agreements and correspondence about them were mailed to the SBA in Washington, D.C. There was testimony that the SBA in fact recertified Wedtech on the basis of the stock purchase agreements, so there is adequate proof that the submission of the SBAs deprived DOD of control over how its money was spent.

The court has dismissed Racketeering Act Seven. The court therefore makes no *Geaney* finding as to this racketeering act.

Racketeering Act Eleven charges that from mid–1984 until early 1986, John Mari-

otta bribed Stanley Simon by offering him $50,000. Fred Neuberger testified that he promised Simon $50,000 and that he told Mariotta about the promise. Neuberger's statements are admissible under Rule 803(3) to show Neuberger's intent to pay the $50,000 and under Rule 801(d)(2)(B) as an adopted admission against Mariotta. Mariotta was president of Wedtech at the time the promise was made and it can fairly be inferred from his failure to protest the promise that he acquiesced in Neuberger's statement. With respect to this charge, Ceil Lewis testified that $50,000 was actually paid to Simon from F.H.J. funds, and the relevant checks are in evidence pursuant to Rule 803(6). Anthony Guariglia's charts showing the distribution of the F.H.J. funds and GX1204 and GX1205, showing disbursements from F.H.J. in 1984 and 1985, demonstrate that the payments to Simon depleted John Mariotta's share of the F.H.J. money. The fact that Stanley Simon was the Bronx Borough President at the time the offer and payment were made is not contested. The above evidence plus the timing of the offer and payment prove by a fair preponderance that John Mariotta agreed to bribe Stanley Simon.

Racketeering Act Twelve charges that in 1982 and 1983, John Mariotta gave 5% of Wedtech stock as a bribe or gratuity to Congressman Biaggi. Several witnesses testified as to this charge that John Mariotta promised 5% of Wedtech's stock to Congressman Biaggi. Fred Neuberger testified that John Mariotta insisted upon giving 5% because Congressman Biaggi could not do Wedtech any good if he disliked them and because he could do a lot of damage. Mariotta's statements are admissible pursuant to Rule 801(d)(2)(A). An early draft of an agreement transfering stock to Biaggi & Ehrlich (GX15) and the final signed agreements, drafted by Delson & Gordon (GX18A–D), are in evidence pursuant to Rule 803(6). The Prospectus (GX149) and GX18A–D show that 5% of Wedtech's stock was issued to Bernard Ehrlich and Richard Biaggi. The evidence that Congressman Biaggi was a congressman from the Bronx at the time the prom-

ise was made is not contested. The independent evidence just mentioned plus evidence that Wedtech continued to seek Congressman Biaggi's assistance after the transfer of the stock suffices to show that Mariotta agreed to give Congressman Biaggi 5% of Wedtech's stock as a bribe or gratuity.

Racketeering Act Thirteen charges that in 1984 John Mariotta gave Congressman Biaggi a $50,000 bribe. The fact that Congressman Biaggi was a public official in 1984 is not contested. Anthony Guariglia testified about a meeting before the approval of the lease for One Loop Drive in which John Mariotta told Congressman Biaggi that Wedtech would pay $50,000 for help with that matter. GX3E-8 and GX409 have been identified as the Wedtech check and the Biaggi & Ehrlich invoice describing the payment as a fee for help with a Ports and Terminals matter. The invoice is dated June 19, 1984 and was stamped received by Wedtech on June 26, 1984. The check was dated July 13, the day after the final vote on One Loop Drive took place. Considering the timing of these events, the court finds proof by a preponderance of the evidence that John Mariotta agreed to make the payment to influence Congressman Biaggi's lobbying effort on Wedtech's behalf.

The Government has withdrawn Racketeering Act Fourteen. Therefore, the court makes no *Geaney* finding with respect to this racketeering act.

Racketeering Act Fifteen charges that in 1985, John Mariotta offered Peter Neglia 20,000 shares of Wedtech's stock as a bribe or gratuity. As to this charge, Moreno said that he told Mariotta before the Superbowl party in 1985 about the offer to Neglia of a stock option for 20,000 shares. Mariotta's failure to protest the offer shows that he acquiesced to the promise at that time, so Moreno's statement may be admitted under Rule 801(d)(2)(B). The documentary evidence showing the issuance of an option in Ronald Betso's name has already been discussed. The Board of Directors' Minutes reveal that John Mariotta voted to approve the issuance of the options. The evidence that the court found sufficient to show that Neglia agreed to

accept the options as a bribe or gratuity is also sufficient to show that it was promised for either purpose. In sum, the aforementioned independent evidence suffices to show by a preponderance that Mariotta agreed to give Neglia the options as a bribe or gratuity.

A *Geaney* finding that John Mariotta participated in the RICO conspiracy requires proof by a preponderance of independent evidence that he agreed to conduct, or participate in the conduct of, Wedtech through a pattern of racketeering activity by agreeing to commit at least two racketeering acts. The court finds by a preponderance of the independent evidence that John Mariotta agreed to conduct Wedtech's affairs by committing each of the outstanding racketeering acts. Moreover, the evidence shows that the racketeering acts were known by John Mariotta to have been part of an ongoing scheme to use unlawful means to obtain the benefits of the 8(a) program, and that he committed those acts in furtherance of Wedtech's affairs, so there is adequate independent evidence to show that John Mariotta agreed to conduct Wedtech's affairs through a pattern of racketeering activity. Given the independent evidence just discussed, the jury is entitled to consider coconspirator hearsay statements against John Mariotta.

## BERNARD EHRLICH

The first two elements have been addressed.

The third element is abundantly proved by testimony and documentary evidence that Bernard Ehrlich served as Wedtech's lawyer for eight years, that he was a major stockholder, and that he became a member of Wedtech's Board of Directors.

The independent evidence of the fourth element—unlawful, knowing, willful agreement to participate in the conduct of Wedtech's affairs, directly and indirectly, by agreeing to do two or more of the racketeering acts listed in Count One through a pattern of racketeering—follows below.

Bernard Ehrlich is charged with committing six racketeering acts: 1) aiding and abetting Congressman Biaggi's receipt of

5% of Wedtech's stock as extortion, a bribe, or a gratuity, or committing, or aiding and abetting Congressman Biaggi's commission of, mail fraud with respect to the stock; 2) aiding and abetting Congressman Biaggi's receipt of $50,000 as extortion or a bribe, or committing, or aiding and abetting Congressman Biaggi's commission of, mail fraud with respect to the $50,000; 3) mail fraud by executing sham stock purchase agreements; 4) aiding and abetting Peter Neglia's receipt of a $4500 bribe or a $3,000 gratuity; 5) aiding and abetting Peter Neglia's receipt of an option for 20,000 shares of Wedtech's stock as a bribe or gratuity; and 6) aiding and abetting the attempt to obtain half of Peter Neglia's salary at Biaggi & Ehrlich as a bribe or gratuity. *Geaney* requires that evidence admitted other than by means of Rule 801(d)(2)(E) show by a fair preponderance that Bernard Ehrlich agreed to commit two or more of these racketeering acts as part of a pattern of racketeering activity. The independent evidence discussed below shows that Bernard Ehrlich agreed to commit each of the racketeering acts with which he is charged.

Racketeering Act One charges Ehrlich with aiding and abetting Congressman Biaggi's extortion of 5% of Wedtech's stock or aiding and abetting the Congressman's demand and receipt of that stock as a bribe or gratuity. The indictment also alleges that Ehrlich either committed mail fraud, or aided and abetted Congressman Biaggi's commission of mail fraud, with respect to the transfer of the stock. As to this charge, Mario Moreno testified that Ehrlich asked for and obtained a copy of the stock transfer agreement drafted by Delson & Gordon to use as a model for a similar agreement that would be drafted in fulfillment of a promise made to Congressman Biaggi. Ehrlich's draft (GX15) and the final agreements (GX18A–D) are in evidence. Moreno also testified that Ehrlich constantly pressured him to get John Mariotta to sign the agreements. Moreno said Ehrlich told him that Congressman Biaggi wanted the stock in Richard Biaggi's name. The Prospectus showing the stock transfer to Ehrlich and Richard Biaggi is in evidence.

(GX149) A letter from Squadron Ellenoff, and a copy thereof endorsed by Ehrlich, also indicate that he received the stock certificates that were mailed to him by the law firm. The court finds on the basis of this independent evidence, the timing of the transfer, nonhearsay evidence of Ehrlich's close relationship with Congressman Biaggi and Ehrlich's knowledge of Congressman Biaggi's official position and influence that Ehrlich agreed to aid and abet Congressman Biaggi's demand and receipt of 5% of Wedtech's stock as extortion, a bribe, or a gratuity, or that he agreed to commit, or to aid and abet Congressman Biaggi in committing, mail fraud.

Racketeering Act Two charges Ehrlich with aiding and abetting Congressman Biaggi's demand for $50,000 as extortion or a bribe, or with committing, or aiding and abetting the commission of, mail fraud with respect to obtaining that payment. The independent evidence that Bernard Ehrlich agreed to commit, or aid and abet Congressman Biaggi's commission of, this racketeering act follows below.

Mario Moreno testified that at a meeting with Ehrlich and Congressman Biaggi, Ehrlich said that the retainer paid by Wedtech was not enough to cover the work on One Loop Drive because there was extra work involved in trying to convince other Boro presidents to vote for the lease. Anthony Guariglia testified that he explained at a meeting with Congressman Biaggi and Bernard Ehrlich how to fill out the invoice that would be submitted for the $50,000 payment. Guariglia's directions, if the directions can be considered a "statement" subject to the hearsay rule in the first place, are admissible under Rule 803(3) to show his intention to comply with the demand for $50,000. The directions are additionally admissible under Rule 801(d)(2)(B) because the fact that Biaggi & Ehrlich's invoice was filled out in accordance with Anthony Guariglia's instructions indicates that Ehrlich and the Congressman acquiesced in Guariglia's directions. The invoice is in evidence pursuant to Rule 803(6) as is the check showing actual payment. (GX409) This evidence shows that Ehrlich

agreed to commit, or to aid and abet the commission of, mail fraud. Ehrlich's close relationship with Congressman Biaggi, his awareness of Congressman Biaggi's official position and influence, and the timing of the payments suggest that Ehrlich agreed to aid and abet Congressman Biaggi's commission of extortion or bribe-receiving.

Racketeering Act Six charges that from mid–1983 until February 1986, Bernard Ehrlich committed mail fraud against DOD by executing a sham stock purchase agreement. The following independent evidence shows by a fair preponderance that Ehrlich agreed to commit this racketeering act.

There was testimony from a number of witnesses about several meetings attended by Bernard Ehrlich at which the stock purchase agreement and the planned default by John Mariotta were discussed. The witnesses also testified that John Mariotta promised to default in Ehrlich's presence. Testimony showed that Congressman Biaggi demanded in Ehrlich's presence that the initial payment occur after only one year. A Government witness testified that Ehrlich was present when Congressman Biaggi agreed to extend the stock purchase agreement payment deadline for an additional year. This court's determination that these statements should be admitted pursuant to Rule 801(d)(2)(B) is confirmed by the documentary evidence that Ehrlich actually executed the stock purchase agreement in the form demanded by Congressman Biaggi (GX163B), that Ehrlich confirmed by letter the agreement to extend the stock purchase agreement (GX29B), and that on December 17, 1985, only weeks before John Mariotta was scheduled to default on the first payment, Ehrlich executed a Rescission Agreement (GX204), whereby John Mariotta returned the stock in a fashion designed to avoid the negative tax consequences that Ehrlich and other sellers would have otherwise incurred upon a default. The Government also introduced the associated Escrow Agreement (GX163D), which a Government witness testified made it easy for the seller to repossess his shares and regain voting power upon a default. The stock purchase agreement was submitted to the SBA and formed the basis for Peter Neglia's recommendation that Wedtech be permitted to remain in the 8(a) program (GX171).

Racketeering Act Eight charges that in 1984 and 1985, Ehrlich aided and abetted Peter Neglia's receipt of money to be paid on Peter Neglia's and his designee's behalf as a bribe or gratuity. The following evidence shows that Ehrlich agreed to commit this racketeering act.

Mario Moreno testified that Bernard Ehrlich delivered a request that Wedtech pay for Peter Neglia's and Joseph Neglia's memberships in the Inner Circle at $1,000 a piece. GX313A, a check for $2,000, covering Mario Moreno's and Peter Neglia's Inner Circle memberships, is in evidence pursuant to Rule 803(6). Moreno testified that the check was given to Bernard Ehrlich to deliver to Joseph Neglia. Moreno also testified that he gave Bernard Ehrlich three checks for $1,000 (GX315A) to pay for Empire Club memberships for Moreno, Peter Neglia, and Joseph Neglia in 1984. Moreno further testified that Ehrlich requested a $2,500 check to renew the Empire Club memberships for 1985. The $2,500 check and a $500 check from Biaggi & Ehrlich annotated "attn: Gen. B. Ehrlich" are in evidence. (GX317A–1, 317A–3). In this testimony and these documents, in conjunction with circumstantial evidence that Ehrlich was aware of Neglia's official position, the court finds proof by a fair preponderance that Ehrlich agreed to aid and abet Peter Neglia in obtaining these payments as a bribe or gratuity.

Racketeering Act Nine alleges that in 1985, Ehrlich aided and abetted Peter Neglia's demand and receipt of an option for 20,000 shares of Wedtech stock as a bribe or gratuity from Wedtech. The evidence below shows by a fair preponderance that Ehrlich agreed to commit this racketeering act.

Mario Moreno testified about a meeting with Bernard Ehrlich and Peter Neglia over the inaugural weekend during which Ehrlich said it was time to see what compensation could be given to Neglia. More-

no also testified that at Joseph Neglia's birthday party, Ehrlich said it was time to finalize the options for Neglia. Moreno testified that Ehrlich assisted him in obtaining Ronald Betso's social security number. Given the timing of the first discussion, evidence that Wedtech still had options on the pontoon contract to obtain in 1985, and evidence of Ehrlich's close relationship with Neglia while Neglia was an SBA official, the court finds adequate independent proof that Ehrlich agreed to aid and abet Peter Neglia's demand of an option for 20,000 shares of stock as a bribe or gratuity.

Racketeering Act Ten charges Ehrlich with aiding and abetting the attempt in 1985 to procure half of Neglia's salary at Biaggi & Ehrlich from Wedtech as a bribe or gratuity. The following evidence proves by a fair preponderance that Ehrlich agreed to commit this racketeering act.

Moreno testified about a conversation with Ehrlich and Neglia in the fall of 1984 in which Ehrlich informed Neglia that Ehrlich had spoken to Moreno, that Moreno knew Neglia wanted to work for Biaggi & Ehrlich, and that the company would participate in funding Neglia's salary. Moreno also reported that over the inaugural weekend, Ehrlich told him that Peter Neglia would be working for Biaggi & Ehrlich when he left Government and Ehrlich said the salary would be $100,000 annually. Moreno also said that in the latter half of 1985, Ehrlich told him that Neglia was desperate to leave the SBA. Moreno said that they needed to convince Neglia to stay two more months. Moreno's statement is admissible under Rule 801(d)(2)(B) and to supply the context of Ehrlich's next communication. Ehrlich met with Peter Neglia and reported that Neglia would stay but that Wedtech must pay half of his salary at Biaggi & Ehrlich. Anthony Guariglia said Ehrlich told him in late 1985 that Peter Neglia would be joining Biaggi & Ehrlich and that Moreno had agreed to increase Wedtech's retainer payments to offset Neglia's salary. Given the timing of the initial discussion, evidence that Wedtech still had options on the pontoon contract to obtain in 1985, and evidence of Ehrlich's close relationship with Neglia while Neglia

was an SBA official, the court finds adequate independent proof that Ehrlich agreed to aid and abet Peter Neglia's demand of half of his salary at Biaggi & Ehrlich as a bribe or gratuity.

The court finds by a preponderance of the evidence admissible otherwise than pursuant to Rule 801(d)(2)(E) that the racketeering acts, which Bernard Ehrlich has been shown to have agreed to commit, were known by Ehrlich to be part of Wedtech's ongoing scheme to use unlawful means to obtain the benefits of the 8(a) program, and that he agreed to commit them in furtherance of Wedtech's affairs, so there is adequate independent evidence to show that Bernard Ehrlich agreed to participate in the conduct of Wedtech through a pattern of racketeering activity. Therefore, the jury is entitled to consider coconspirator hearsay statements against Bernard Ehrlich.

## RICHARD BIAGGI

■ The first two elements have already been addressed.

As to the third element, the court finds that the Government has introduced sufficient evidence of Richard Biaggi's association with the Wedtech Corporation. Although all witnesses who addressed the issue testified that he did little legal work for Wedtech, Mario Moreno observed that at one point he did indeed do considerable Wedtech-related work: in Moreno's words, he "had a lot of meetings" with Anthony Guariglia and Squadron Ellenoff in connection with the stock issuance to himself and Ehrlich. Irwin Wolf also placed him at the center of activity on the stock issuance. Wolf testified that Richard Biaggi definitely attended the meeting at which it was allegedly determined that the only way to achieve the effects Congressman Biaggi wanted from the stock issuance was to give the stock to Richard rather than to the law firm of Biaggi & Ehrlich or to Ehrlich and the Congressman, individually.

Richard Biaggi and Ehrlich were sole owners and officers of Four Star and Five Star, corporations whose sole reason for

being, according to the testimony, was to collect kickbacks on Wedtech subcontracts.

The testimony of Carlos Cuevas, Jr. established relations between Richard Biaggi and Wedtech. Although Richard Biaggi may not, in general, have done much legal work for Wedtech, he did ask Cuevas to prepare at least one memo on a question related to the stock issuance. Cuevas testified, moreover, that Richard Biaggi attended the Board of Estimate meetings about Wedtech's application for the One Loop Drive property.

Finally, the stock certificates were issued in Richard Biaggi's name. There is an exhibit in evidence, a covering letter from Arthur Siskind to Richard Biaggi, that is countersigned by Richard Biaggi, acknowledging receipt of the certificates.

As to the fourth element, there is a fair preponderance of evidence, excluding hearsay evidence admissible only under the co-conspirator exception, to show that Richard Biaggi agreed to violate § 1962(c) by committing at least two racketeering acts.

First, there was an agreement between Richard Biaggi and at least Mario Moreno to commit mail fraud and, on Richard Biaggi's part, to aid and abet bribery and gratuity offering by lending his name to the 5% stock issuance, for the 2½% to be held by his father. There is evidence of agreement in the fact that he signed the relevant documents. The Government has introduced a letter from Mario Moreno to him, with his signature acknowledging acceptance, setting forth the terms of the stock issuance. The Government has also introduced into evidence the copy of the stock purchase agreement that was actually signed by John Mariotta. Both documents, constitute mailings for the purpose of a mail fraud count. Both documents, being signed by Richard Biaggi, are admissible as admissions, evidencing his agreement to participate in a fraudulent scheme.

It remains to show that, with respect to the mail fraud counts, Richard Biaggi had knowledge that there was a fraudulent scheme. Such knowledge would also show that he knowingly and willingly aided and abetted acts of bribery and gratuity offering. The evidence comes from testimony that he was present at meetings at which the true nature of the stock schemes was discussed. Irwin Wolf testified that Richard Biaggi attended the Spring 1983 meeting at which it was decided, allegedly by Congressman Biaggi himself, that Congressman Biaggi's stock should be issued in his son's name. As for the stock purchase agreement, Mario Moreno testified that Richard Biaggi attended the Fall 1983 Helmsley Palace meeting at which the tax consequences of that agreement were discussed. These statements are admissible pursuant to Rule 801(d)(2)(B) because Richard Biaggi's subsequent acceptance of the stock and signing of the stock purchase agreements manifests his adoption of them.

The aforementioned evidence proves by more than a fair preponderance that Richard Biaggi agreed to commit two racketeering acts, and thus assures that all coconspirator statements against him are admissible.

## RONALD BETSO

■ The first two elements have been addressed.

The third element is proved by testimony that Ronald Betso attended the 1985 inaugural events at Wedtech's expense and attended fundraising and social events also attended by officers of Wedtech. The Rolodex with Ronald Betso's social security number and the Stock Option Agreement in his name are also evidence of his association with Wedtech.

The independent evidence of the fourth element—unlawful, knowing, willful agreement to do two or more of the racketeering acts listed in count one through a pattern of racketeering—is as follows.

Ronald Betso is charged with committing two racketeering acts: 1) aiding and abetting Peter Neglia's receipt of a stock option for 20,000 shares of Wedtech stock as a bribe or gratuity and 2) making false statements to a Department of Labor agent. *Geaney* requires that evidence admitted other than by means of Rule 801(d)(2)(E)

show by a fair preponderance that Ronald Betso agreed to commit these two racketeering acts through a pattern of racketeering activity.

Racketeering Act Nine charges Betso with aiding and abetting Peter Neglia in obtaining an option for 20,000 shares of Wedtech stock as a bribe or gratuity. The court finds proof by a preponderance of evidence admissible otherwise that pursuant to Rule 801(d)(2)(E) that Betso agreed to commit this act.

Several witnesses testified that Peter Neglia and Ronald Betso attended the inaugural events at Wedtech expense. Mario Moreno testified that a few weeks later, he joined Ronald Betso, Bernard Ehrlich, Joseph Neglia and possibly Peter Neglia at a restaurant where Joseph Neglia said he wanted the paperwork taken care of as soon as possible. Ronald Betso said he was interested in becoming a consultant for Wedtech. Moreno also testified that at Joseph Neglia's birthday party, Moreno sat near Bernard Ehrlich and in front of Peter Neglia and Ronald Betso. Moreno testified that Peter Neglia said he wanted everything in Ronald Betso's name and Ronald Betso said he would also be interested in having a job at Wedtech. The statements of Peter Neglia and Joseph Neglia come in pursuant to Rule 801(d)(2)(B), and Ronald Betso's own statements are admissible pursuant to Rule 801(d)(2)(A). In addition to these statements, the Rolodex with Ronald Betso's social security number (GX341-A), the Board Minutes (GX327A), and the Stock Option Agreement (GX328) in Ronald Betso's name are in evidence. In conjunction with the testimony just described, the court infers that Wedtech did not go to the trouble of having the option prepared and voted without first obtaining Betso's consent and cooperation. Together, the testimony and documentary evidence suffice to prove by a fair preponderance that Ronald Betso agreed to assist Peter Neglia in obtaining the options as a bribe or gratuity.

Racketeering Act Eighteen charges Ronald Betso with obstructing justice by making false statements on February 2, 1987 to a Special Agent with the Department of Labor Office of Labor Racketeering. The following evidence proves by a preponderance that Betso agreed to commit this racketeering act.

Special Agent Cossu testified that he and an associate interviewed Ronald Betso on February 2, 1987. Cossu said that he told Betso at the beginning that Cossu was participating in a Grand Jury investigation concerning allegations that Betso was involved with Wedtech. Cossu testified that Betso told him that Betso had had no conversations with either Peter or Joseph Neglia regarding stock options and that no one ever asked him to serve as a nominee for a stock option. These statements directly contradict the evidence presented by the Government. Cossu also testified that Betso turned up music that was playing in the room before the interview began, that Betso showed concern when Cossu handed Betso a Grand Jury subpoena, and that Betso asked Cossu if the conversation had been taped. The court finds that these actions show guilty knowledge. The evidence that Betso actually made false statements in conjunction with the evidence of his guilty knowledge and close friendship with Peter Neglia proves by a preponderance of independent evidence the existence of a tacit agreement to cover up his role in securing the stock options for Peter Neglia, should he be asked about it.

The court finds by a preponderance of the independent evidence that both of these acts, which Ronald Betso has been shown to have agreed to commit, were known by Betso to be part of Wedtech's ongoing criminal practice of giving items of value to Government officials who the Wedtech officers believed could assist Wedtech in obtaining the benefits of the 8(a) program and its practice of deceiving Government agents. There is evidence of his knowledge of this practice in the evidence discussed above regarding the stock option and Ronald Betso's and Peter Neglia's attendance at inaugural events as Wedtech's guests. Therefore, there is adequate independent evidence to show that Ronald Betso agreed to participate in the conduct of Wedtech through a pattern of racketeering activity, and the jury is entitled to consider

coconspirator hearsay statements against Ronald Betso.

## CONCLUSION

Pursuant to *Geaney*, this court finds proof by a preponderance of the evidence admissible otherwise than under Rule 801(d)(2)(E) that each of the defendants in this case participated in the RICO conspiracy alleged in Count Two of the present indictment. Therefore, coconspirator declarations may be considered by the jury against each of the defendants.